**UNITED STATES of America,**
**Plaintiff,**

v.

**W.R. GRACE, Alan R. Stringer, Henry A. Eschenbach, Jack W. Wolter, William J. McCaig, Robert J. Bettacchi, O. Mario Favorito, Robert C. Walsh, Defendants.**

**No. CR 05–07–M–DWM.**

United States District Court,
D. Montana,
Missoula Division.

March 3, 2006.

Angelo J. Calfo, Harold Malkin, Michelle K. Peterson, Yarmuth Wilsdon Calfo, Seattle, WA, Michael F. Bailey, Bailey & Antenor, William Adam Duerk, Michael J. Milodragovich, Milodragovich Dale Steinbrenner & Binney, Missoula, MT, David S. Krakoff, Gary A. Winters, Mark Holscher, Mayer Brown Rowe Maw LLP, Washington, DC, Ronald F. Waterman, Gough Shanahan Johnson & Waterman, Palmer A. Hoovestal, Hoovestal Law Firm, Helena, MT, Jeremy Maltby, O'Melveny & Myers, Los Angeles, CA, Elizabeth Van Doren Gray, Sowell Gray Stepp & Lafitte, Columbia, SC, William A. Coates, Roe Cassidy Coates & Price, Greenville, SC, for Defendants.

## ORDER

MOLLOY, Chief Judge.

### I. Introduction

Defendants W.R. Grace and Co., a Connecticut corporation ("Grace"), and current and former Grace employees Alan R. Stringer, Henry A. Eschenbach, Jack W. Wolter, William J. McCaig, Robert J. Bettacchi, O. Mario Favorito and Robert C. Walsh, are charged by a ten-count Indictment with crimes arising from Grace's operation of a vermiculite mine near Libby, Montana (the "Libby Mine"). The Defendants are charged with conspiracy to violate the Clean Air Act and to defraud the United States in violation of 18 U.S.C. § 371 (Count I); violation of the Clean Air Act, 42 U.S.C. § 7413(c)(5)(A) (Counts II, III and IV); wire fraud in violation of 18 U.S.C. §§ 1343, 2 (Counts V and VI); and Obstruction of Justice in violation of 18 U.S.C. §§ 1505, 2 (Counts VII, VIII, IX and X). The charges relate to the Defendants' alleged role in the release and distribution throughout the Libby area of asbestos contaminated vermiculite.

Several motions to dismiss have been filed by the Defendants. They are:

(1) Defendants' joint motion[1] pursuant to Rule 8(a), Fed.R.Crim.P., to dismiss Count I of the Indictment as duplicitous (dkt # 248);

(2) Defendants' joint motion[2] pursuant to Rule 7(c), Fed.R.Crim.P., to dismiss Counts I through IV of the Indictment for failure to allege a required element, i.e., that the Defendants were aware that their conduct in violation of the Clean Air Act was unlawful (dkt # 250);

(3) Defendants Grace, Stringer, Wolter and Bettacchi's motion to dismiss Counts II through IV of the Indictment for failure to allege breach of an emissions standard (dkt # 254);

(4) Defendants Grace, Stringer, Wolter and Bettacchi's motion to dismiss Counts II through IV of the Indictment for failure to sufficiently apprise the Defendants of the nature of the offense charged (dkt # 255);

(5) Defendant Grace's motion[3] to dismiss Counts II through IV of the Indictment on statute of limitations and duplicity grounds (dkt # 249); and

(6) Defendants Grace, Stringer, Wolter and Bettacchi's motion to dismiss Counts V and VI[4] for failure to state an offense (dkt ##252, 253).

The government opposes all of the motions, but has filed its own motion to dismiss Counts V and VI for failure to allege the required element of materiality. The government's motion to dismiss the wire fraud counts is granted and Counts V and VI are dismissed for the reasons set forth below. Furthermore, the Statute of Limitations has run on some aspects of other charges so that the proof will be limited as set forth and explained in this Order.

## II. Background common to all pending motions

Count I of the Indictment charges:

That beginning on or about 1976, and continuing until on or about 2002, at Libby, and other locations within and without the District of Montana, the defendants, W.R. GRACE, ALAN R. STRINGER, HENRY A. ESCHENBACH, JACK W. WOLTER, WILLIAM J. McCAIG, ROBERT J. BETTACCHI, O. MARIO FAVORITO, and ROBERT C. WALSH, and others known and unknown to the grand jury did knowingly combine, conspire and agree among themselves and others:

### OBJECTS OF THE CONSPIRACY

a. To knowingly release and cause to be released into the ambient air a hazardous air pollutant, namely asbestos, and at the time knowingly placed persons, including: families of employees of W.R. GRACE Libby vermiculite mining and processing operations; residents of Libby, Montana and surrounding communities in Lincoln County; and others in imminent danger of death or serious bodily inju-

---

1. The motion is signed by counsel for Defendant Grace on behalf of all Defendants.

2. The motion is signed by counsel for Defendant Eschenbach on behalf of all Defendants.

3. The motion is signed by counsel for Defendant Grace and does not purport to be filed on behalf of all Defendants. Defendants Stringer, Wolter and Bettacchi filed a joinder to Grace's motion, including ten additional pages of briefing (dkt # 251). Grace's Opening Brief in support of its motion is a full twenty pages; the joinder thus constitutes an attempt by Defendants Stringer, Wolter and Bettacchi to submit more than twenty pages of briefing on a single motion without regard to Local Rule CR 12.1(b).

4. Defendant Bettacchi is not charged in Count VI.

ry in violation of 42 U.S.C. § 7413(c)(5)(A).

b. To defraud the United States and others by impairing, impeding, and frustrating the governmental functions of the United States, including the United States Environmental Protection Agency (EPA) and the Department of Health and Human Services, specifically, the National Institute for Occupational Safety and Health ("NIOSH"); being federal agencies responsible for administering federal laws and regulations designed to protect public health and safety and the environment in violation of 18 U.S.C. § 371.

Count II charges:

That beginning on or about November 15, 1990, and continuing until the present, at Libby, within the State and District of Montana, defendant W.R. GRACE did knowingly release and caused to be released into the ambient air a hazardous air pollutant, namely, asbestos, and at the time, knowingly placed another person, namely the residents of the town of Libby and Lincoln County in imminent danger of death or serious bodily injury by providing and distributing asbestos contaminated vermiculite material to the community; and by causing defendant W.R. GRACE employees and their personal effects to be contaminated with asbestos, in violation of 42 U.S.C. § 7413(c)(5)(A), 18 U.S.C. § 2.

Count III charges:

That beginning on or about December, 1993, and continuing until on or about June 15, 2000, at Libby within the State and District of Montana, the defendants, W.R. GRACE, ALAN R. STRINGER, JACK W. WOLTER, and ROBERT J. BETTACCHI did knowingly release and caused to be released into the ambient air a hazardous air pollutant, namely, asbestos, and at the time knowingly placed another person in imminent danger of death or serious bodily injury by selling real property known as the "Screening Plant" to the Parker family, in violation of 42 U.S.C. § 7413(c)(5)(A), 18 U.S.C. § 2.

Count IV charges:

That beginning on or about November 15, 1990, and continuing until on or about the summer of 2000, at Libby within the State and District of Montana, the defendants, W.R. GRACE, ALAN R. STRINGER, JACK W. WOLTER, and ROBERT J. BETTACCHI did knowingly release and caused to be released into the ambient air a hazardous air pollutant, namely, asbestos, and at the time knowingly placed another person in imminent danger of death or serious bodily injury by leasing a property known as the "Export Plant" to the Burnetts and selling the property known as the "Export Plant" to the City of Libby, in violation of 42 U.S.C. § 7413(c)(5)(A), 18 U.S.C. § 2.

Count V charges:

That from on or about November, 1992 and continuing until late April, 2000, at Libby, within the State and District of Montana, the defendants W.R. GRACE, ALAN R. STRINGER, JACK W. WOLTER, and ROBERT J. BETTACCHI, having devised or intending to devise a scheme or artifice to defraud that is to obtain money from the Parkers and to avoid liability by selling property known as the "Screening Plant" to the Parkers without disclosing the health hazard associated with tremolite asbestos contamination on the property, did for the purpose of executing said scheme, on April 12, 2000 transmit or cause to be transmitted by means of wire, communications in interstate or foreign commerce, namely, a Letter of Intent, describing

defendant W.R. GRACE's plan for cleaning the "Screening Plant" and the compensation the Parker's would receive, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

Count VI charges:

That from on or about 1994 and continuing until late July, 2000, at Libby, within the State and District of Montana, defendants W.R. GRACE, JACK W. WOLTER and ALAN R. STRINGER having devised or intending to devise a scheme or artifice to defraud, that is to avoid liability by selling and subsequently purchasing properties known as the "Mine site" and "Flyway" from KDC, Inc., did for the purpose of executing said scheme, on July 12, 2000, transmit or cause to be transmitted by means of wire, communications in interstate or foreign commerce, wiring instructions directing the transmission of payment for the purchase of KDC, Inc. stock, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

### III. Analysis

#### A. Defendants' joint motion to dismiss Count I of the Indictment as duplicitous

The Defendants invoke Rule 8(a), Fed. R.Crim.P., to dismiss Count I of the Indictment as duplicitous. They argue that Count I charges two distinct conspiracies, one spanning the years 1976 through 1995 and consisting of criminal acts done in the course of operating the Libby Mine [5] and for the purpose of maintaining the mine as a going concern, and a second conspiracy occurring from 1999 until 2002 consisting of criminal acts done for the purpose of covering up the earlier conspiracy.

**5.** The Indictment alleges that Grace ceased vermiculite mining at the Libby Mine in 1990, but continued vermiculite processing opera-

### 1. Background

Count I of the Indictment contains the following paragraphs relevant to the Defendants' motion to dismiss that count as duplicitous:

72. It was a purpose of the conspiracy to conceal and misrepresent the hazardous nature of the tremolite asbestos contaminated vermiculite, thereby enriching defendants and others.

73. It was a purpose of the conspiracy to increase profits and avoid liability by misleading the government and preventing the government from using its authorities to protect against risks to human health and the environment associated with the manufacture, processing, distribution, commerce, use, handling, disposal, and release of tremolite asbestos contaminated vermiculite.

### MANNER AND MEANS OF THE CONSPIRACY

The following manner and means, among others, were used by the defendants to effectuate and perpetuate the conspiracy set forth above:

74. It was part of the conspiracy that the defendants obtained knowledge of the hazardous nature of the tremolite asbestos contaminated vermiculite through various means, including, but not limited to: scientific testing and analysis, including animal studies; epidemiological studies of employees; employee medical screening and examinations; employee medical record reviews; collection and evaluation of a deceased employee's lung tissue; review of employee death certificates; conducting employee morbidity and mortality studies; employee autopsy reviews; review

tions at the Libby Mine and the nearby Screening Plant until 1992. *See* Indictment, ¶ 27.

of medical and scientific literature; reviewing reports from insurance carriers; and reviewing employee worker's compensation claims.

75. It was part of the conspiracy that the defendants obtained knowledge of the propensity of tremolite asbestos contaminated vermiculite, when disturbed, to release fibers into the ambient air (also known as "friability") through various means, including, but not limited to: product testing, including attic simulation and vermiculite materials handling tests ("drop tests"); and air and bulk sampling at the Libby Mine and other defendant W.R. GRACE facilities in and around Libby, Montana, at defendant W.R. GRACE owned and licensed expansion plants, at the facilities of customers using vermiculite materials, and at the Libby High School track.

76. It was part of the conspiracy that the defendants concealed the full extent of their knowledge of the hazardous nature and friability of the tremolite asbestos contaminated vermiculite from employees of defendant W.R. GRACE Libby vermiculite mining and processing operations; families of employees of defendant W.R. GRACE Libby vermiculite mining and processing operations; industrial customers of defendant W.R. GRACE Libby vermiculite products; employees of industrial customers of defendant W.R. GRACE Libby vermiculite products; residents of Libby, Montana and surrounding communities in Lincoln County, Montana; and government authorities.

77. It was part of the conspiracy that the defendants obstructed, impeded, and frustrated the governmental authorities by withholding information regarding the hazardous nature and friability of the tremolite asbestos contaminated vermiculite and asserting that the Libby Mine operations and Libby vermiculite posed no risk to public health and safety and the environment.

\* \* \*

79. It was part of the conspiracy that the defendants sold and leased tremolite asbestos contaminated real property and withheld information about the contamination from the purchasers of the property.

\* \* \*

82. It was part of the conspiracy that the defendants falsely described, concealed from, and failed to reveal to the government the hazardous nature and friability of the tremolite asbestos in the Libby vermiculite and the health hazards associated with exposure to tremolite asbestos.

83. It was part of the conspiracy that the defendants obstructed, impaired, impeded, and misled EPA during the course of EPA's emergency response to the asbestos contamination in and around Libby, Montana.

The "Overt Acts" portion of the Indictment charges the following conduct relevant to the pending motion:

(1) In 1976, Defendant Eschenbach compiled a study which described the incidence of lung disease among Grace employees at the Libby Mine (Indictment, ¶ 84).

(2) Grace commissioned a study in 1976 intended to test the effects of tremolite asbestos on hamsters. A preliminary draft of the report concluded that the number of hamster deaths was evidence that tremolite asbestos caused cancer (¶¶ 85–88).

(3) Grace commissioned a review of employee x-rays in 1977 to determine the risks posed by exposure to tremolite and the benefits of improved dust controls at the Libby Mine. The review

found "numerous cases of asbestos disease" among Grace employees (¶¶ 89–92).

(4) Grace conducted an internal audit in 1981 which included a review of employee x-rays. The audit revealed a 38.4% incidence of lung abnormalities for employees working from 1976 though 1980 and concluded that each additional year of tremolite exposure adds 1.5% to the incidence of lung abnormality (¶¶ 93–97).

(5) In 1980, Grace learned of lung problems among employees at O.M. Scott, a processing facility in Ohio that handled ore from the Libby mine. In 1983, a doctor who studied O.M. Scott employees informed Grace executives that the health problems there were caused by exposure to Grace's vermiculite (¶¶ 98–102).

(6) In 1982, Grace commissioned a mortality study which included that an excessive number of employees at the Libby Mine had died of cancer of the respiratory system (¶¶ 103–04).

(7) Beginning in 1980, in response to a statement by NIOSH representatives that the agency was interested in conducting an epidemiological study at the Libby Mine, Grace executives sought to dissuade NIOSH through obstruction and other means (¶¶ 105–114).

(8) From 1977 through 1982, Grace conducted in-house testing to determine whether tremolite fibers were released into the air from its commercial and consumer products (¶¶ 115–27).

(9) Grace failed to provide certain of the studies and tests described above in response to requests by the EPA pursuant to the Toxic Substances Control Act.[6] Grace failed to fully respond to such requests in 1983, 1986 and 1992 (¶¶ 128–32).

(10) In the early nineties, Grace began exploring options for the sale of its Libby properties, including the mine site. After prospective buyer 3M declined the purchase because of "potential environmental problems," Defendant Stringer wrote a memo to Defendant Wolter providing this analysis of Grace's position:

> For the same reasons that 3M would not buy the mine, I doubt any other large corporation will come forward with an offer to buy the entire property. If Grace is going to be able to transfer all of the future responsibilities and liabilities to someone else, they are going to have to be willing to sell to some small organization.

(¶¶ 150–55).

(11) Grace sold its Screening Plant property to Lincoln County residents Mel and Lerah Parker in 1993. In 1994, Grace sold the Libby Mine site and other properties to Kootenai Development Company (KDC). Grace donated its Export Plant property to the City of Libby in 1994–95 (¶¶ 156–68).

(12) In 2000, knowing that the EPA's Superfund Emergency Response Team was negotiating with KDC to use the mine site to return contaminated materials removed from the Libby community, Grace paid $2.3

---

**6.** Section 8(e) of the Toxic Substances Control Act, 15 U.S.C. § 2607(e) requires that any person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information that reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the Administrator of EPA of such information, unless the person has actual knowledge that the Administrator has been adequately informed of such information.

million to regain control of the mine site. Grace then denied the Superfund Emergency Response Team access to the mine site (¶¶ 169–72).

(13) From 1999 through 2002, Grace and Defendant Stringer made a series of false and misleading statements in response to EPA CERCLA 104(e)[7] requests and engaged in other acts intended to obstruct the EPA investigation into asbestos contamination in Libby (¶¶ 173–84).

## 2. Discussion

The duplicitous argument about Count I is based on the premise that because the two objects of the charged conspiracy (i.e., release of asbestos into the air and concealment of the known dangers of asbestos-contaminated vermiculite) were fully accomplished when Grace ceased Libby operations in 1992 and sold its Libby properties in 1995, there are two different conspiracies charged in one count. Defendants say the conduct charged from 1999 through 2002 was not contemplated or agreed upon by the members of the "first" conspiracy and as such constitutes a separate conspiracy to cover up the earlier illegal conduct. The distinction advanced by the Defendants is important from their perspective because it would likely mean that the "first" conspiracy, spanning the years 1976 to 1995, is time-barred due to the five-year statute of limitations applicable to conspiracies charged under 18 U.S.C. § 371.[8] In such a scenario the only actionable conduct would be the "second"

conspiracy beginning in 1999, in which only Defendants Grace and Stringer are alleged to have committed overt acts.

The prosecution argues that Count I charges a single agreement to achieve all of the criminal ends alleged in Count I, including false statements and obstruction in response to the EPA investigation undertaken years after Grace closed the Libby Mine.

### a. Legal standard

■ An indictment is duplicitous where a single count joins two or more distinct offenses. *United States v. Ramirez–Martinez*, 273 F.3d 903, 913 (9th Cir.2001) (citation omitted). Rule 8(a), Fed. R.Crim.P. provides:

> The indictment may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

■ The requirement that multiple offenses be charged in separate counts is intended to eliminate the constitutional problems created when two or more offenses are joined in a single count. "A duplicitous indictment compromises a defendant's Sixth Amendment right to know the charges against him, as well as his Fifth Amendment protection against double jeopardy." *United States v. King*, 200

---

**7.** Under Section 104(e)(2) of CERCLA, 42 U.S.C. § 9604(e)(2), designated EPA personnel

 may require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information and documents relating to such matter:

 (A) The identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a

vessel or facility or transported to a vessel or facility.

 (B) The nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a vessel or facility.

 (C) Information relating to the ability of a person to pay for or perform a cleanup.

**8.** *See* 18 U.S.C. § 3282.

F.3d 1207, 1212 (9th Cir.1999). A duplicitous indictment also carries with it the risk of a non-unanimous verdict on the duplicitous count. *United States v. Aguilar,* 756 F.2d 1418, 1420 n. 2 (9th Cir.1985).

### i. Test for assessing claims of duplicity

■ In deciding whether an indictment is duplicitous, "[t]he court limits its review to a reading of the indictment itself to determine *whether it may be read to charge a single violation."* *King,* 200 F.3d at 1212 (citing *Aguilar,* 756 F.2d at 1422) (emphasis added). Instead of using the limited review prescribed in *King,* the Defendants urge the Court to employ the "overall agreement/relevant factors" test set forth in *United States v. Gordon,* 844 F.2d 1397 (9th Cir.1988), to determine whether the conduct charged in Count I constitutes two distinct conspiracies. A hard look at the case law shows that *King's* limited review is the applicable test at this stage of the case.

In *Gordon,* the defendants were accused of conspiring to rig bids for military hardware contracts. 844 F.2d at 1398–1400. During the investigation into the defendants' conduct, the defendants destroyed documents and took other steps intended to avoid detection of their wrongdoing. *Id.* The defendants were convicted on Count I of the indictment, which charged them with:

conspiracy to commit offenses against and to defraud the United States of America as follows:

1. To defraud the United States of America and in particular the United States Navy of its program for the design, development, construction and distribution of military hardware under the Trident Ballistic Missile Program administered honestly, fairly and free from corruption, deceit, dishonesty and kickbacks;

2. To conceal, cover up; and obstruct an investigation by this Grand Jury into that wrongdoing.

*Id.* at 1401.

In *Gordon,* the defendants argued that Count I of the indictment was duplicitous. The appeals panel began its analysis of the argument by stating the test for duplicity: "Our task is solely to assess whether the indictment can be read to charge only one violation in each count." *Id.* at 1400 (citing *United States v. Mastelotto,* 717 F.2d 1238, 1244 (9th Cir.1983)). The court held that the defendants had waived their objection to the form of the indictment because they failed to raise the issue of duplicity prior to trial as required by Rule 12(b)(2), Fed. R.Crim.P. 844 F.2d at 1400. Nonetheless, the court went on to consider whether the conduct charged in Count I of the *Gordon* case constituted two conspiracies:

In this case Gordon first raised the duplicity issue in his Rule 29 motion at the close of the government's case-in-chief and he has not made any showing of good cause. We conclude that appellants have waived an objection to the *form* of the indictment and their right to force the government to divide Count I into two separate conspiracy counts. Appellants, however, have a right under Article III, sec. 2 and the sixth amendment to a unanimous jury verdict. This constitutional claim was not waived.

*Id.* at 1400–01 (emphasis in original) (citation omitted).

In analyzing the defendants' constitutional claim, the *Gordon* panel considered "whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy." *Id.* at 1401 (quoting *United States v. Moran,* 759 F.2d 777, 784 (9th Cir.1985)). The *Gordon* court then listed the relevant factors to be considered in determining the existence of

such an overall agreement: the nature of the scheme; the identity of the participants; the quality, frequency and duration of each conspirator's transactions; and the commonality of times and goals. *Id.* at 1401 (citing *United States v. Arbelaez,* 719 F.2d 1453, 1457 (9th Cir.1983)). It is this "overall agreement/relevant factors" test that the Defendants argue should apply in this case. But, as was discussed at the hearing on this motion, there is a distinct procedural difference between *Gordon* and the situation confronted here.

█ The structure of the *Gordon* opinion belies the Defendants' contention that the overall agreement/relevant factors test applies at this stage. The *Gordon* court expressly stated that it was not considering an objection to the form of the indictment, and made clear that objections to the form were to be resolved pursuant to the "limited review" test. Instead, the *Gordon* court was assessing whether the defendants were subjected to the risk of a non-unanimous jury verdict. The relevant factors test it employed in making that assessment is markedly of a different character than the limited review test associated with pretrial challenges for duplicity. This distinction is apparent from the *Gordon* court's application of the relevant factors test, for which the court relied upon a review of the evidence at trial. 844 F.2d at 1401 ("The evidence does not show that the parties contemplated or discussed any plans for a coverup."). At the pretrial stage, during which a challenge to the form of the indictment must be raised under Rule 12(b)(2), it is impossible for the court to consider the evidence heard at trial.[9]

Other Ninth Circuit cases confirm that the overall agreement/relevant factors test

advanced by the Defendants does not apply to their current motion to dismiss. In *United States v. Zemek,* 634 F.2d 1159, 1167 (9th Cir.1980), defendants charged with racketeering argued that the evidence adduced at trial demonstrated that conduct charged as a single conspiracy was in fact two distinct conspiracies. The reviewing court applied the overall agreement/relevant factors test and, like the *Gordon* court, looked to the evidence at trial for its application. *Id.* at 1167–68 ("The evidence revealed a continuing relationship among participants organized in a hierarchical pattern."). The *Zemek* opinion contains no mention of a duplicity argument at either the trial or appellate stage. In *United States v. Jabara,* 618 F.2d 1319 (9th Cir.1980) which the *Gordon* court cites as authority for the "overall agreement" portion of its test, defendants convicted of a narcotics conspiracy claimed that the evidence adduced at trial showed that the conduct charged as one conspiracy was in fact several conspiracies. *Id.* at 1327. The reviewing court looked for an "overall agreement" between the defendants and determined based on the evidence at trial that such an agreement existed. *Id.* at 1328.[10] As in *Zemek,* there is no mention of a duplicity challenge.

These cases reveal more than a nominal distinction between the "limited review" test and the "overall agreement/relevant factors" test. The latter applies in those cases where the government has charged a single conspiracy but the defendant alleges a variance between the charge and the proof at trial because the proof has shown that the conduct charged constitutes more than one conspiracy. In such cases, the "overall agreement/relevant factors" test is used to determine whether

---

9. All parties argued the evidence and the normative propriety of the Indictment during oral argument on the motion despite the applicable legal standard.

10. The "relevant factors" portion of the "overall agreement/relevant factors" test was added by the *Zemek* court later in 1980. *See* 634 F.2d at 1168.

the conduct charged constitutes only one conspiracy. By contrast, the "limited review" test is used when the defendant is making a pretrial objection under Rules 12(b)(2) and 8(a) to the form of the indictment as duplicitous. Unlike the overall agreement/relevant factors test, the duplicity inquiry necessarily proceeds without reference to the evidence at trial. "In reviewing an indictment for duplicity, our task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count." *United States v. Martin*, 4 F.3d 757, 759 (9th Cir.1993) (quoting *United States v. Yarbrough*, 852 F.2d 1522, 1530 (9th Cir. 1988)). If Count I can be read to charge only one violation, the Defendants' motion to dismiss Count I as duplicitous will be denied.

### ii. Remedies available upon a finding of duplicity

■ If duplicity is established, a trial court may (1) allow election, provided the defendant is not prejudiced thereby and the election does not alter the nature of the charge, or (2) dismiss the offending count. *Aguilar*, 756 F.2d at 1423. Another option is to address the duplicitous indictment by instructing the jury that all members are required "to agree as to which of the distinct charges the defendant actually committed." *Ramirez–Martinez*, 273 F.3d at 915.

### b. When acts of concealment may be viewed as acts in furtherance of a conspiracy

In deciding whether the indictment can be fairly read to charge only one offense, it is helpful to refer to case law discussing the circumstances under which acts of concealment may be considered part of the original scheme. Both parties cite the Supreme Court's decision in *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), in support of their positions.

In *Grunewald*, the defendants were charged with conspiring to defraud the government by taking bribes from companies under investigation by the Bureau of Internal Revenue in exchange for using their influence with Bureau officials to procure "no prosecution" rulings for their beleaguered clients. 353 U.S. at 394–95, 77 S.Ct. 963. A congressional investigation into the defendants' wrongdoing began in 1951, two years after the last of the "no prosecution" rulings was obtained and the last bribes were paid in 1949. *Id.* at 395–96, 77 S.Ct. 963. In response to the investigation, the defendants doctored records, warned their clients not to talk and attempted to influence witness testimony. *Id.* When the defendants were eventually charged in 1954 with conspiracy to defraud the United States, the charged conduct included their post–1951 efforts at concealment. *Id.* at 394 n. 3, 77 S.Ct. 963. The defendants argued on appeal that the conspiracy count was barred by the three-year statute of limitations[11] because the acts done to conceal the conspiracy were not part of the original agreement, meaning the last act in furtherance of the conspiracy took place in 1949, well outside the statute of limitations. *Id.* at 397–98, 77 S.Ct. 963. The government argued that although the main objective of the conspiracy was to obtain the "no prosecution" rulings, the conspiracy necessarily includ-

---

11. The statute of limitations for violations of 18 U.S.C. § 371 was three years at the time of the offense committed in *Grunewald*. It was lengthened to five years on September 1, 1954. *Grunewald*, 353 U.S. at 398 n. 9, 77 S.Ct. 963.

ed a subsidiary agreement to conceal the conspiracy. *Id.* at 398, 77 S.Ct. 963.

Quoting its opinion in *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), the *Grunewald* Court rejected the government's argument:

Conspirators about to commit crimes always expressly or implicitly agree to collaborate with each other to conceal facts in order to prevent detection, conviction and punishment. Thus the (Government's) argument is that even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective.

We cannot accept the Government's contention.

353 U.S. at 400, 77 S.Ct. 963 (quoting *Krulewitch,* 336 U.S. at 444, 69 S.Ct. 716).

The *Grunewald* Court went on to state:

The crucial teaching of Krulewitch and [*Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953) ] is that after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment. As was there stated, allowing such a conspiracy to conceal to be inferred or implied from mere overt acts of concealment would result in a great widening of the scope of conspiracy prosecutions, since it would extend the life of a conspiracy indefinitely. Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the

initial agreement among the conspirators.

353 U.S. at 401–02, 77 S.Ct. 963.

In holding that the government sought to infer an agreement to conceal from "elements which will be present in virtually every conspiracy case, that is, secrecy plus overt acts of concealment," the Court observed, "[t]here is not a shred of direct evidence in this record to show anything like an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." *Id.* at 404, 77 S.Ct. 963. The Court nonetheless left open the possibility that acts of concealment might be included as part of an original conspiratorial agreement.

By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

353 U.S. at 405, 77 S.Ct. 963.

Ninth Circuit cases applying *Grunewald* have delineated those circumstances in which acts of concealment may be viewed as furthering the main criminal objectives of a conspiracy. In *United States v. Finlay,* 55 F.3d 1410 (9th Cir.1995), the defendant was convicted of two conspiracies to defraud the United States. The first occurred between January and October of 1987 and involved a series of undocumented illegal shipments of nuclear materials by the defendant's company. *Id.* at 1412. The second conspiracy occurred between August and November of 1987 and had as its objective to defraud the government by obtaining through false state-

ments the reinstatement of the company's license to possess radioactive materials, which had been suspended when the Nuclear Regulatory Commission (NRC) learned of two of the illegal shipments. *Id.*

The last of the illegal shipments occurred on August 18, 1987. *Id.* at 1413. The NRC discovered two of the illegal shipments that same month. Despite the company's efforts to persuade the NRC not to impose a penalty, the NRC suspended the company's license on September 21, 1987. *Id.* Two weeks later, on October 5, 1987, the company filed a "request for recision or relaxation of order" with the NRC in hopes of having its license reinstated. Attached to the request were false documents which the company submitted as evidence that the illegal shipments were supported by proper documentation. *Id.*

The defendant was indicted on September 16, 1992. On appeal, the defendant argued that the conspiracy to make illegal shipments ended with the last illegal shipment in August of 1987 and that prosecution of that conspiracy was time-barred because of the five-year statute of limitations. *Id.* at 1415. The government disagreed, arguing that the submission of false documents on October 5, 1987 was done in furtherance of the conspiracy to make illegal shipments. The court, applying the Supreme Court's decision in *Grunewald,* concluded that the falsification of documents after the shipments were complete was nonetheless part of the main criminal object of the smuggling conspiracy:

> The main conspiracy charged in Count I of the indictment in our case was a conspiracy to defraud the United States. The submission of the false documents prepared for the Johnston Island shipments was part of the main conspiracy to defraud the United States by concealing from the NRC the violation of its rules governing shipments. The con-

spiracy, as charged, embraced both the illegal shipments and the illegal absence of documentation and false documentation. It was an essential part of this conspiracy to continue to mislead the NRC and for that purpose on October 5 the false documentation was submitted. As the main conspiracy continued through the commission of this overt act, prosecution was not barred by the statute of limitations. That the false documents also played a part in the second conspiracy to get back the license does not mitigate their use to further the goal of the first conspiracy.

*Id.* at 1415–16.

By contrast, in *United States v. Vowiell,* 869 F.2d 1264 (9th Cir.1989), the Ninth Circuit held that acts taken by a co-conspirator to help escaped prison inmates avoid capture were not a part of the original conspiracy to assist escape. The defendant in *Vowiell* was charged with conspiracy to assist in the escape of several fellow inmates. Following the escape, which took place on April 16, 1986, the escapees were transported to various hideouts over the next several days. *Id.* at 1265. On April 20, four days after the escape, the defendant told a fellow inmate/co-conspirator that the escapees needed to move from their current hideout because law enforcement was closing in. *Id.* at 1266. The inmate then relayed the defendant's statement to her brother, a co-conspirator on the outside, so that the brother could get the message to the escapees. *Id.* The brother testified for the government at the defendant's trial and recounted the instructions to relocate which he had received from the defendant by way of his sister. The trial court held the sister's hearsay statement admissible as a co-conspirator statement under Rule 802(d)(2)(E), Fed.R.Evid. *Id.*

The defendant argued on appeal that the sister's statement relaying his instructions to the escapees was inadmissible because it was not made in furtherance of the conspiracy to assist escape. The Ninth Circuit agreed, holding that the escape which was the object of the conspiracy was completed when the escapees had successfully fled "beyond immediate active pursuit." *Id.* The Court stated:

Any further assistance could have, at most, constituted harboring or concealing. [The sister], however, was not charged with that offense. Nor did the conspiracy charged in the indictment encompass such harboring. Further, there was no evidence that [the sister] agreed to assist the escapees beyond leaving the prison confines and making a getaway to some kind of refuge. No ongoing assistance seems to have been contemplated.

*Id.*

 What these cases show is that acts taken to conceal a criminal conspiracy will be considered acts in furtherance of the conspiracy when the acts of concealment were contemplated by the original conspiratorial agreement and carried out in furtherance of the main criminal objectives of the charged conspiracy. As the Ninth Circuit stated in *United States v. Walker*, 653 F.2d 1343 (9th Cir.1981),

[T]he mere continuance of the result of a crime does not continue the crime. . . . But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, and there is such continuous cooperation, (the conspiracy continues).

*Id.* at 1347 (quoting *United States v. Kissel*, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168 (1910)). The *Walker* court went on to write: "Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such an agreement may reasonably be inferred, the conspiracy may be found to continue." 653 F.2d at 1350 (quoting *United States v. Hickey*, 360 F.2d 127, 141 (7th Cir.1966)).

In light of this authority, it is now necessary to examine Count I of the Indictment in this case to determine whether it may be fairly read to charge only one offense. The measure of that answer lies with *King* and *Aguilar*, and must be confined to a review of the Indictment. This means that rather than looking for *evidence*, what is examined is whether there are *allegations* that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or allegations from which such an agreement may reasonably be inferred.

### c. The conspiracy charged in Count I

 The Defendants argue that Count I contains allegations of one conspiracy ending in 1995 and a second conspiracy to conceal beginning in 1999. This argument is based on a mischaracterization of the objects of the conspiracy charged in Count I, in particular the object of defrauding the United States.[12] The Defendants argue that Count I charges them with conspiring to "defraud federal regulatory agencies in order to keep the mine operating and to avoid further regulation of Grace's Libby vermiculite products." Defs.' Op. Br., pp.

---

12. The prosecution does not argue that the post–1999 acts of concealment relate to the objective of releasing pollutants into the air in violation of the Clean Air Act; accordingly, this analysis focuses on whether the post– 1999 acts of concealment can be read to be part of the objective to defraud the United States charged in Paragraph 71(b) of the Indictment.

13–14. This narrow view of the purpose of the defrauding conspiracy as solely to maintain the mining operation as a going concern allows the Defendants to claim that the conspiracy was complete upon closure of the mine: "At that point, of course, the Defendants could no longer conceal scientific research and mislead Government agencies in order to continue operation of the mine without government interference. In other words, the objective of defrauding the government to facilitate the Libby operation was complete." *Id.* at 15.

Contrary to the Defendants' view, the defrauding conspiracy charged in Count I is fairly aimed at both facilitation of the Libby Mine as a going concern and avoidance of liability for the Defendants' actions. That the conspiracy charged contained a "liability avoidance" component is clear from the language of Count I, which reads,

> It was a purpose of the conspiracy to increase profits *and* avoid liability by misleading the government and preventing the government from using its authorities to protect against risks to human health and the environment associated with the manufacture, processing, distribution, commerce, use, handling, disposal, and release of tremolite asbestos contaminated vermiculite.

Indictment, ¶ 73 (emphasis added).

There is no dispute that acts such as withholding information from the government about the dangers of exposure to Libby vermiculite and obstructing government plans to conduct health studies of the Libby miners further the goal of keeping up the mine as a profitable business. The question is whether, on a fair reading, those acts also further the purpose of liability avoidance. Many of the overt acts which Defendants argue relate exclusively to the goal of maintaining a profitable mining concern free of regulation can also be fairly read to be intended in part to avoid liability. Withholding information and obstructing government investigation has the direct benefit of preventing potentially burdensome regulation which might require the company to follow costly safety procedures. But those tactics would also benefit the company by keeping damaging information from those who might seek to hold the company liable for their injuries. Information given to the government might filter down to Grace employees or employees of Grace's industrial customers, who in turn might seek to hold Grace liable for asbestos-related health problems. Moreover, withholding information about the dangers of processed ore prevents the possibility that the government might (as it eventually did) require that processed ore disposed of within the Libby community be removed at the company's expense.

The sale of the Libby Mine site to KDC in 1994 may also prove that liability avoidance was a goal of the charged conspiracy well before the Superfund investigation began in 1999. Before the sale to KDC, Grace allegedly negotiated with several other companies, including 3M, to sell the mine site. The Indictment alleges that in 1993 Defendant Stringer wrote Defendant Wolter a memo summarizing Grace's sales options and offered this conclusion:

> For the same reasons that 3M would not buy the mine, I doubt any other large corporation will come forward with an offer to buy the entire property. If Grace is going to be able to transfer all of the future responsibilities and liabilities to someone else, they are going to have to be willing to sell to some small organization.

Indictment, ¶ 155. Grace's mining and milling operations had concluded at the time this memo was allegedly written. Even so, the allegations show Defendants continued to act to avoid liability after the mine had ceased as a going concern. This

allegation undermines the Defendants' argument that the defrauding conspiracy was aimed solely at keeping the mine operating and that the conspiracy ended when Grace shut down its operation.[13] A fair reading of Paragraph 155, in conjunction with Paragraph 73 and the Indictment's allegations that Grace withheld information from the government and others, allows the reasonable inference that liability avoidance was a goal of the charged conspiracy from the beginning.[14]

On this reading, the acts of concealment taken in response to the EPA's Superfund investigation from 1999 through 2002 were merely a continuation of the conspiracy to defraud the government in order to avoid liability. In this regard, the Defendants' conduct in response to the Superfund investigation is analogous to the concealment efforts of the smugglers in *Finlay* after the NRC learned of the illegal shipments. In *Finlay*, the court held that the conspiracy embraced both illegal shipments and the illegal absence of proper documentation, and that it was therefore an essential part of the conspiracy to continue to mislead the NRC by submitting false documents months after the shipments were complete. 55 F.3d at 1415. In this case, the defrauding objective of the charged conspiracy embraced both facilitation of the mining operation and avoidance of liability for the harmful effects of Libby vermiculite ore on people and property. It was arguably an essential part of the charged conspiracy to continue to mislead the EPA to avoid liability resulting from the Superfund investigation.

The court in *Vowiell* held that acts constituting harboring were not done in furtherance of a conspiracy to escape where (1) the conspiracy as charged did not encompass harboring and (2) there was no evidence that the conspirators agreed to provide ongoing assistance to the escapees once they had left the prison confines and made a getaway. 869 F.2d at 1268. By contrast, the conspiracy charged in this case expressly names liability avoidance as a purpose in Paragraph 73 and includes direct and circumstantial allegations from which one may fairly infer that the genesis of the liability avoidance goal occurred long before the EPA's Superfund investigation in 1999.[15] As a result, this case

---

13. In this regard, the Defendants' contention that the last act in furtherance of the defrauding conspiracy took place in 1986 is suspect. Paragraph 132 of the Indictment charges that the Defendants failed to fully respond to an EPA request pursuant to TSCA 8(e) in 1992. Also, while the Defendants argue that the sale to KDC was an act in furtherance of the objective to violate the Clean Air Act, there is no basis for that contention. The Indictment does not allege any post–1994 human presence at the mine site or any expectation on Grace's part at the time of the sale that people would be placed in imminent danger at the mine site after Grace had ceased operations. A much more plausible reading of the Indictment, particularly in light of the allegations in Paragraph 155, is that Grace's sale of the mine to KDC was intended to avoid liability and was therefore an act in furtherance of the defrauding objective.

14. Grace's alleged effort to avoid liability by selling off its contaminated Libby properties was likely to be futile in light of the expansive reach of CERCLA's liability provisions. *See* 42 U.S.C. § 9607(a)(2).

15. At oral argument the Defendants claimed that the post–1999 conduct charged in the Indictment can not be alleged to have been contemplated by the original conspiratorial agreement because it is impossible for the Defendants to have known at the genesis of the alleged conspiracy that they would need to mislead the EPA twenty years later. This argument is flawed because (1) Rule 7(c), Fed.R.Crim.P., does not require such specificity as to force the government to allege every discrete criminal act in which the conspiracy eventually resulted; and (2) whether a given act was in fact contemplated by the original conspiratorial agreement is a matter for the jury to decide at trial.

does not present the scenario forbidden by the Supreme Court in *Grunewald,* whereby an agreement to conceal is inferred "merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces." 353 U.S. at 405, 77 S.Ct. 963.

Count I can be fairly read to charge a single offense, i.e., a conspiracy with the dual purposes of violating the Clean Air Act and defrauding the government in order to facilitate operation of the Libby Mine and avoid liability for the effects of asbestos-contaminated vermiculite on humans and the environment. The Ninth Circuit's test for duplicity has not been satisfied by the arguments put forth here.

### d. The Defendants' constitutional rights

The Defendants also contend that Count I violates their rights under the Fifth and Sixth Amendments to the United States constitution, specifically their Fifth Amendment protection against double jeopardy and their Sixth Amendment right to know the charges against them and to be free from the risk of a non-unanimous jury verdict. These concerns are addressed by the Ninth Circuit's test for duplicity, which is designed to protect against violations of those rights. *See King,* 200 F.3d at 1212 ("A duplicitous indictment compromises a defendant's Sixth Amendment right to know the charges against him, as well as his Fifth Amendment protection against double jeopardy."). Satisfaction of *King's* test for duplicity therefore negates any concern relating to those constitutional protections.

There is one remaining constitutional claim. Defendants argue that Count I subjects them to the risk of a non-unanimous jury verdict. The argument or as-

sertion is premature. By their motion, Defendants have objected to the form of the Indictment as duplicitous. If the argument fails and the form of the Indictment is proper, the case can go forward without injury to the Defendants' constitutional rights because the proper presentation of the charge is all that is required at this stage. If the proof at trial shows that the conduct charged in Count I does in fact constitute two distinct conspiracies,[16] steps can be taken to protect the Defendants from the risk of a non-unanimous verdict. Such steps might include curative instructions to the jury, special interrogatories to insure unanimity, or the dismissal of all or part of the offending count.

No violation of the Defendants' constitutional rights results from the denial of their motion to dismiss Count I for duplicity. Accordingly, the Defendants' joint motion to dismiss Count I of the Indictment as duplicitous is denied.

### B. Defendants' joint motion to dismiss Counts I through IV of the Indictment for failure to allege knowledge of unlawful conduct

Defendants move to dismiss Counts I through IV of the Indictment for failure to allege a required element, i.e., that the Defendants were aware that their conduct in violation of the Clean Air Act was unlawful. The United States opposes the motion and argues that the knowing endangerment provision of the Clean Air Act (42 U.S.C. § 7413(c)(5)) does not require proving that an accused knew that his actions were unlawful at the time of the offense. None of Counts I through IV contains an allegation that the persons charged knew that their conduct in violation of the Clean Air Act was unlawful.

---

**16.** In deciding whether the proof at trial demonstrates that the charged conduct constitutes two conspiracies, the Court would apply the overall agreement/relevant factors test set forth in *Gordon. See* 844 F.2d at 1400–01.

### 1. Legal standard

■■ "[A]n indictment is sufficient if: (1) it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend; and (2) it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Hill*, 279 F.3d 731, 741 (9th Cir.2002) (citing *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)); *see also* Fed.R.Crim.P. 7(c)(1). Failure to allege a required element of the charged offense is a fatal flaw requiring dismissal. *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir.1999) ("[I]f properly challenged prior to trial, an indictment's complete failure to recite an essential element of the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal.").

■■ In interpreting a statute to determine what are the required elements, courts should look first to the language of the statute, and second to the legislative history. *United States v. Weitzenhoff*, 35 F.3d 1275, 1283 (9th Cir.1994). A court should seek to "give effect to the plain, common-sense meaning of the enactment without resorting to an interpretation that defies common sense." *United States v. Bonilla–Montenegro*, 331 F.3d 1047, 1051 (9th Cir.2003) (internal quotation marks omitted). The plain language of the statute is to be ignored only when a literal interpretation of the statute would thwart the purpose of the statutory scheme and lead to an absurd result. *County of Santa Cruz v. Cervantes*, 219 F.3d 955, 960 (9th Cir.2000). Courts should also reject any interpretation that would render another statutory provision surplusage or a nullity. *Id.* at 961. Resort to the legislative history for aid in interpreting a statute is only appropriate when the terms of the statute are ambiguous. *Burlington N. R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) ("Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete." (internal quotation marks omitted)).

### 2. Statutory language

The relevant section of the Clean Air Act provides:

> Any person who knowingly releases into the ambient air any hazardous air pollutant listed pursuant to section 7412 of this title or any extremely hazardous substance listed pursuant to section 11002(a)(2) of this title that is not listed in section 7412 of this title, and who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury shall, upon conviction, be punished by a fine under Title 18, or by imprisonment of not more than 15 years, or both. Any person committing such violation which is an organization shall, upon conviction under this paragraph, be subject to a fine of not more than $1,000,000 for each violation.

42 U.S.C. § 7413(c)(5)(A). The next subparagraph sets forth a test for satisfaction of the knowing endangerment requirement for individual defendants:

> In determining whether a defendant who is an individual knew that the violation placed another person in imminent danger of death or serious bodily injury—
>
> (i) the defendant is responsible only for actual awareness or actual belief possessed; and
>
> (ii) knowledge possessed by a person other than the defendant, but not by the defendant, may not be attributed to the defendant;

except that in proving a defendant's possession of actual knowledge, circumstantial evidence may be used, including evidence that the defendant took affirmative steps to be shielded from relevant information.

42 U.S.C. § 7413(c)(5)(B).

The Defendants contend that the phrase "knew that the violation" in § 7413(c)(5)(B) adds an additional element to the offense set forth in § 7413(c)(5)(A), i.e., that the individual defendant knew that his conduct was unlawful.

### 3. Discussion

■ Interpretation of § 7413(c)(5) begins with a reading of the statutory language to see whether the words have a plain and unambiguous meaning. Section 7413(c)(5)(A) requires a knowing release of a hazardous air pollutant leading to knowing endangerment, both of which are charged in Counts I through IV. The Defendants contend that § 7413(c)(5)(B) must be read to add as a required element that an individual defendant acted with knowledge that his conduct was unlawful.[17] The government correctly characterizes the Defendants' motion as reading a required mental state of willfulness into § 7413(c)(5). *See Cheek v. United States,* 498 U.S. 192, 201, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) ("[T]he standard for the statutory willfulness requirement is the 'voluntary, intentional violation of a known legal duty.' ").

Because the statute does not expressly require willfulness, the question for the Court is whether the statute is ambiguous with respect to the required mental state, thereby requiring resort to the legislative history to settle the dispute. The Defendants' tenuous reading of § 7413(c)(5)(B)

cannot obscure the plain meaning of the statute. When read as a whole, § 7413(c)(5)(B) is intended to give added content to the knowing endangerment requirement with respect to individual defendants. There is no articulated reasonable basis to assume that § 7413(c)(5)(B) is intended to change the required mental state explicitly set forth in the previous subparagraph.

In support of their position, the Defendants urge the Court to compare the Clean Air Act to two other environmental statutes, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–7000 (2000), and the Clean Water Act ("CWA"), 33 U.S.C. § 1251–1387 (2000). Both statutes contain knowing endangerment provisions similar to § 7413(c)(5)(A) and provisions defining responsibility similar to § 7413(c)(5)(B). In a provision analogous to § 7413(c)(5)(B), the RCRA provides, "In determining whether a defendant who is a natural person *knew that his conduct* placed another person in imminent danger...." 42 U.S.C. § 6928(f)(2) (emphasis added). Similarly, the CWA provides, "[I]n determining whether a defendant who is an individual *knew that his conduct* placed another person in imminent danger...." 33 U.S.C. § 1319(c)(3)(B)(emphasis added). The crux of the argument is that Congress' use of the phrase "knew that the violation" in § 7413(c)(5)(B) rather than the phrase "knew that his conduct" demonstrates an intention to require a different mental state than the knowing standard that is required for the RCRA and CWA.

The argument is unpersuasive. Congress is aware of the construction courts will give to various terms with respect to

---

**17.** The Defendants argue that the additional element must also be alleged with respect to Defendant Grace, despite the fact that the language upon which the Defendants rely in

support of their argument for the added element applies only to "a defendant who is an individual." No authority is cited for the proposition.

the required mental state, and Congress is able to explicitly require the mental state of willfulness when it wishes to do so. In *Cheek,* in which the Supreme Court discussed the proper construction of tax statutes requiring willfulness, the Court began by stating the general common law rule that ignorance of the law is no defense to a criminal prosecution. 498 U.S. at 199, 111 S.Ct. 604. The Court acknowledged, however, that in the tax context, the law can be so complex that an ordinary citizen cannot be expected to know all of his duties and obligations. *Id.* at 199–200, 111 S.Ct. 604. In such cases, the Court wrote, Congress has deemed it appropriate to require the heightened mental state of willfulness:

> Congress has accordingly softened the impact of the common-law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses. Thus, the Court almost 60 years ago interpreted the statutory term "willfully" as used in the federal criminal tax statutes as carving out an exception to the traditional rule.

498 U.S. at 200, 111 S.Ct. 604. Congress chose not to use the term "willfully" in § 7413(c)(5)(A) and this suggests that Congress did not intend for the Clean Air Act to depart from the traditional rule that ignorance of the law is not a defense to prosecution.

In the context of public welfare statutes such as the Clean Air Act, the Supreme Court has established a presumption against construing statutes to require that the defendant knew that his conduct was unlawful. "[W]here ... dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *United States v. Int'l Minerals & Chem. Corp.,* 402 U.S. 558, 565, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). In *Weitzenhoff,* the Ninth Circuit applied the Supreme Court's rule in *International Minerals* to hold that the Clean Water Act was a public welfare statute of the type contemplated by *International Minerals,* because the CWA was "clearly designed to protect the public at large from the potentially dire consequences of water pollution." 35 F.3d at 1286. Accordingly, the *Weitzenhoff* court concluded that the CWA requires that a defendant act knowingly, and does not impose upon the government the higher standard of willfulness. *Id.* That the Clean Air Act is a public welfare statute under the *International Minerals* definition further undermines the Defendants' contention that § 7413(c)(5) contains an element of willfulness.

Moreover, the interpretation advanced by the Defendants in support of their position would render another provision of § 7413 a nullity. Section 7413(h) provides in part,

> Except in the case of knowing and willful violations, for purposes of paragraphs (1), (2), (3), and (5) of subsection (c) of this section the term "a person" shall not include an employee who is carrying out his normal activities and who is acting under orders from the employer.

That section provides a shield from criminal liability under § 7413(c)(5) for nonmanagerial employees who commit violations in the course of their normal employment activities while acting under orders from an employer. By virtue of the exception in § 7413, an employee whose conduct otherwise satisfies the elements set forth in § 7413(c)(5)(A) will not be liable unless the government can prove the additional element of willfulness. In other words, an employee who is "just following orders" from his employer is not criminally liable under the Clean Air Act unless the govern-

ment can prove that the employee knew that his conduct was unlawful.

The interpretation advanced by the Defendants would render § 7413(h) meaningless. If the Defendants are correct, and all violations of § 7413(c)(5) require that the defendant knew his conduct was unlawful, there is no reason to designate willfulness as the heightened standard applicable to employees acting on the instructions of their employer. Because Congress established a willfulness standard for such employees, it strongly suggests that Congress intended something less than willfulness to be required for violations of § 7413(c)(5). The Defendants' interpretation of § 7413(c)(5) is unpersuasive because it would render the exception provision in § 7413(h) a nullity. *See Cervantes,* 219 F.3d at 961.

The language and structure of § 7413 do not reveal an ambiguity with respect to the requisite mental state for criminal liability of § 7413(c)(5). There is as a result no reason to refer to the legislative history for guidance as the Defendants suggest. *See Newton v. Sec'y of Health and Human Services,* 70 F.3d 1114, 1115 n. 2 (9th Cir. 1995) ("[T]he statute itself is perfectly clear, so resort to legislative history is neither called for nor appropriate.").[18] Moreover, resort to legislative history does nothing to bolster the Defendants' position.

The plain language of the Clean Air Act indicates that it is not a required element of § 7413(c)(5) that the defendant know

that his conduct is unlawful. This interpretation is supported by the structure of the statute, the Supreme Court's presumption against a willfulness standard in interpreting public welfare statutes, and the statute's legislative history. The Defendants' motion to dismiss Counts I through IV for failure to allege knowledge of unlawful conduct is denied.

## C. Defendants Grace, Stringer, Wolter and Bettacchi's motion to dismiss Counts II through IV of the Indictment for failure to allege breach of an emissions standard

Defendants Grace, Stringer, Wolter and Bettacchi move to dismiss Counts II through IV of the Indictment for failure to allege breach of an emissions standard. Counts II through IV charge the Defendants with releasing asbestos in violation of the knowing endangerment provision of the Clean Air Act, 42 U.S.C. § 7413(c)(5). Defendants argue that § 7413(c)(5)(A) requires that the government prove that the release alleged constitutes a violation of emissions standards promulgated by the Administrator of the Environmental Protection Agency ("EPA").[19] Because Counts II through IV lack such allegations, the Defendants say they must be dismissed. The government argues that what the Defendants identify is an affirmative defense to prosecution for a defendant who can demonstrate that the alleged release was done in compliance with the EPA's emissions standards. The govern-

---

**18.** The Defendants also argue that ambiguity in the Clean Air Act requires the Court to apply the rule of lenity, giving the statute the narrowest possible construction in order to restrict prosecution to conduct clearly covered by the statute. *See, e.g., United States v. Wyatt,* 408 F.3d 1257, 1260 (9th Cir.2005). For the same reason that reference to the legislative history is not appropriate, the rule of lenity has no application in this case. *See United States v. Shabani,* 513 U.S. 10, 17, 115

S.Ct. 382, 130 L.Ed.2d 225 (1994)("The rule of lenity, however, applies only when, after consulting traditional cannons of statutory construction, we are left with an ambiguous statute.")

**19.** The emissions standard the breach of which the Defendants argue the government must allege is, with respect to asbestos, "no visible emissions." *See* 40 C.F.R. §§ 61.142– 61.155.

ment tries to bolster its position by asserting that regardless of whether the Court views the emissions clause as an element or an affirmative defense, it has no application in this case because the releases of asbestos alleged in Counts II through IV did not come from a regulated "source" as defined by the Clean Air Act.[20]

None of Counts II through IV contains an allegation that the alleged release was done in violation of emissions standards established by the EPA.

The Clean Air Act's knowing endangerment provision provides:

> Any person who knowingly releases into the ambient air any hazardous air pollutant listed pursuant to section 7412 of this title or any extremely hazardous substance listed pursuant to section 11002(a)(2) of this title that is not listed in section 7412 of this title, and who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury shall, upon conviction, be punished by a fine under Title 18, or by imprisonment of not more than 15 years, or both. Any person committing such violation which is an organization shall, upon conviction under this paragraph, be subject to a fine of not more than $1,000,000 for each violation. If a conviction of any person under this paragraph is for a violation committed after a first conviction of such person under this paragraph, the maximum punishment shall be doubled with respect to both the fine and imprisonment. *For any air pollutant for which the Administrator has set an emissions standard or for any source for which a permit has been issued under subchapter V of this chapter, a re-*

*lease of such pollutant in accordance with that standard or permit shall not constitute a violation of this paragraph or paragraph (4).*

42 U.S.C. § 7413(c)(5)(A) (emphasis added).

The Defendants argue that the final sentence of § 7413(c)(5)(A) (the "emissions clause") establishes as an element of the offense that the release must violate an EPA emissions standard for the hazardous air pollutant at issue.[21] The government says that the emissions clause sets out an affirmative defense to knowing endangerment, not an element which must be alleged and proved by the government.

### 1. Legal standard

#### a. Motion to dismiss

"[A]n indictment is sufficient if: (1) it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend; and (2) it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hill*, 279 F.3d at 741. Failure to allege a required element of the charged offense is a fatal flaw requiring dismissal. *Du Bo*, 186 F.3d at 1179. In deciding a motion to dismiss, a court should not consider evidence not appearing on the face of the indictment. *United States v. Boren*, 278 F.3d 911, 914 (9th Cir.2002). These standards have been discussed and applied above.

#### b. Statutory interpretation

The obligation imposed upon the government by Rule 7(c)(1) that it must allege all elements of a statutory offense does not

---

**20.** The Court does not consider the government's second argument because the argument in effect invites a ruling on the applicability of an affirmative defense, a question the resolution of which should be left for trial.

**21.** Presumably, under the Defendants' theory, this "element" could also be satisfied by an allegation that the release was done in violation of a permit issued to a "source" pursuant to the statute.

require an indictment to allege the inapplicability of an affirmative defense. "[A]n indictment ... founded on a general provision defining the elements of an offense ... need not negative the matter of an exception made by a proviso or other distinct clause...." *United States v. Gravenmeir,* 121 F.3d 526, 528 (9th Cir.1997) (quoting *McKelvey v. United States,* 260 U.S. 353, 357, 43 S.Ct. 132, 67 L.Ed. 301 (1922)). In deciding whether a statutory provision is an element of the offense or an affirmative defense, the Ninth Circuit has looked to several factors, including the text of the statute, the breadth of the exception or element, the ease with which each party could meet the burden of proof on the issue, and the legislative history. *See, e.g., United States v. Freter,* 31 F.3d 783, 788 (9th Cir.1994) (statutory text, breadth of exception, ease of proof), *United States v. Pearson,* 274 F.3d 1225, 1232–33 (9th Cir. 2001); (statutory text, breadth of exception, legislative history).

 In considering the language of the statute, the Court is guided by the "well-established rule ... that a defendant who relies upon an exception to a statute made by a proviso or distinct clause, whether in the same section of the statute or elsewhere, has the burden of establishing and showing that he comes within the exception." *Freter,* 31 F.3d at 788 (quoting *United States v. Green,* 962 F.2d 938, 941 (9th Cir.1992)). This rule "is not limited to statutes in which the relevant language is in a separate section ... or in which the relevant language is in a separate sentence from that describing the elements of the crime." *Freter,* 31 F.3d at 788 (citations omitted). With regard to the breadth of the exception, the Ninth Circuit has stated: "When a statutory prohibition is broad and a defendant seeks to apply a narrow exception to the prohibition, it is more likely than not that the exception is an affirmative defense." *Pearson,* 274 F.3d at 1232 (quoting *Freter,* 31 F.3d at 788).

With these principles in mind it is necessary to decide whether the emissions clause in the knowing endangerment provision of the Clean Air Act sets forth a prerequisite for criminal liability or an affirmative defense to criminal liability. This appears to be an issue of first impression in the federal courts.

**2. Discussion**

 The structure of the text of § 7413(c)(5)(A) suggests that the emissions clause is an affirmative defense. The paragraph begins with a sentence setting forth the elements of the offense and the penalty, followed by two sentences providing special penalties in certain situations. The concluding sentence—the one Defendants claim sets forth an additional element of the offense—states in relevant part, "For any air pollutant for which the Administrator has set an emissions standard ... a release of such pollutant in accordance with that standard ... shall not constitute a violation of this paragraph or paragraph (4)." 42 U.S.C. § 7413(c)(5)(A). The implication of the sentence is that Congress contemplated that there may be some air pollutants covered by § 7413(c)(5)(A) for which the EPA Administrator has not set an emissions standard. It is impossible in such a case for the knowing endangerment offense to include, as the Defendants argue, an element requiring the government to show that the knowing release was done in violation of an EPA emissions standard.

The first sentence of § 7413(c)(5)(A) reads in relevant part:

Any person who knowingly releases into the ambient air any hazardous air pollutant listed pursuant to section 7412 of this title or any extremely hazardous substance listed pursuant to section 11002(a)(2) of this title that is not listed in section 7412 of this title, and who

knows at the time that he thereby places another person in imminent danger of death or serious bodily in jury shall, upon conviction, be punished....

The Defendants urge the Court adopt an interpretation of the statutory offense that would read as follows if acceptable:

Any person who knowingly releases into the ambient air any hazardous air pollutant listed pursuant to section 7412 of this title or any extremely hazardous substance listed pursuant to section 11002(a)(2) of this title that is not listed in section 7412 of this title, *and who makes the release in violation of an emissions standard set by the Administrator*, and who knows at the time that he thereby places another person in imminent danger of death or serious bodily in jury shall, upon conviction, be punished....

Such a reading removes from the scope of the statute any release of a hazardous air pollutant for which the Administrator has not set an emissions standard. To accept this reading requires an assumption that Congress, despite stating initially that the knowing release of *any* hazardous air pollutant listed under section 7412 shall be punished, in fact meant to shrink the list of pollutants covered through the use of a separate sentence otherwise detached from the elements of the offense. It is more plausible that Congress intended to provide an affirmative defense for those releases that do not exceed emissions standards where such standards exist.

Put another way, the exception created by the emissions clause is narrower than the offense. The offense covers all releases of all hazardous air pollutants listed in § 7412 regardless of the size or quantity of the release so long as the release causes imminent danger. The emissions clause protects from criminal liability those who release pollutants covered by an emissions standard (a subset of all hazardous air pollutants) in a quantity which does not exceed that standard (a subset of all releases). Where the statutory prohibition is broad and the exception is narrow, it is more probable that the exception is an affirmative defense. *Gravenmeir*, 121 F.3d at 528.

The structure of § 7412 confirms that the Clean Air Act does not require that every hazardous air pollutant listed (and therefore every pollutant covered by the knowing endangerment provision) be assigned an emissions standard. The hazardous air pollutants covered in § 7413(c)(5)(A) include all those listed in § 7412(b), which in turn lists 191 pollutants, one of which is asbestos. Following the 1990 Amendments to the Clean Air Act, EPA was required to identify categories of sources [22] for each of those pollutants. Congress then directed EPA to promulgate emissions standards for all major sources and for those selected area sources which EPA determines present a threat of adverse health effects. 42 U.S.C. § 7412(a)(1)-(3), (c)(1)-(3), (d)(1). Nothing in this statutory structure requires that an emissions standard be established for every hazardous air pollutant listed in § 7412(b). This is consistent with the implicit assumption in § 7413(c)(5)(A) that there may not be a standard for every hazardous air pollutant ("For any air pollutant for which the Administrator has set

---

**22.** There are two types of sources relevant to this discussion. A "major source" is

any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants.

42 U.S.C. § 7412(a)(1).

An "area source" is "any stationary source of hazardous air pollutants that is not a major source." 42 U.S.C. § 7412(a)(2).

an emissions standard,...."). In this regard, the Defendants' lengthy discussion of the history of EPA emissions standards relating to asbestos is unavailing. The question here is one of statutory interpretation. It does not matter whether EPA has promulgated an emissions standard for the pollutant at issue in this case. The particular facts set forth in the Indictment have no bearing on the analysis. *See Boren*, 278 F.3d at 914 (emphasizing that in deciding a motion to dismiss, a court should not consider evidence not appearing on the face of the indictment). The relevant question is whether Congress meant to only criminalize the knowing release of a hazardous air pollutant which causes endangerment if the release violates an emissions standard set by the EPA. The text and structure of the statute show Congress did not so intend.[23]

The Defendants argue that the structure of § 7413(c)(5) suggests that the emissions clause is an element of the offense because it is contained in the subparagraph, 7413(c)(5)(A), which defines the offense. The Ninth Circuit has made clear, however, that the location of the language providing the exception does not control the analysis. *Freter*, 31 F.3d at 788. In *Freter*, the defendant was charged under

CERCLA[24] with failure to inform a governmental agency of the release of a hazardous substance. The statute under which the defendant was charged provided that " '[a]ny person ... in charge of a facility from which a hazardous substance is released, *other than a federally permitted release*, ... who fails to notify immediately the appropriate agency' may be subject to penalties." *Id.* at 787 (quoting 42 U.S.C. § 9603(b)(3)) (emphasis in original). The defendant argued that it was an essential element of the offense that the release was not "federally permitted." *Id.* The *Freter* court rejected the argument that the placement of the "federally permitted" exception in the same sentence as the elements of the offense meant that the exception must be treated as an element. *Id.* at 788. In deciding that the exception was an affirmative defense, the panel noted that the exception was narrower than the offense and that it would be much easier for the defendant to prove that the release was permitted under any one of the ten potentially applicable statutory provisions than for the government to prove that the release was not permitted under all ten of them. *Id.* at 788–89. The Defendants' argument based on the placement of the exception therefore fails.[25]

23. The Defendants erroneously contend that "[i]f the Government need not allege breach of a regulatory standard, then it can prosecute felony [Clean Air Act] charges against any person allegedly 'causing,' even indirectly, *any level* of human exposure to airborne asbestos fibers." Defs.' Op. Br. at 2 (emphasis in original). The Defendants' contention misread an essential element of the knowing endangerment offense. The statute requires that the defendant knowingly "cause" another person to be placed in imminent danger of death or serious bodily injury, 42 U.S.C. § 7413(c)(5)(A), not merely that the defendant cause any level of human exposure. The Defendants' misreading appears to rely upon the government's allegation in Paragraph 47 of the Indictment that "[m]odern science has not established a safe level for asbestos expo-

sure for which there is no increased risk of disease." That allegation does not satisfy any element of any offense charged in the Indictment, and must be proved at trial before the government can rely on it in any event.

24. Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601–9675 (2000).

25. Defendants contend that Congress' use of subparagraph (C) to set forth an affirmative defense shows that the emissions clause is not meant to be an affirmative defense, presumably because if Congress had so intended it would have placed the emissions clause in subparagraph (C) as well. Subparagraph (C) provides an affirmative defense to the knowing endangerment offense if the endangerment was knowingly consented to by the

Legislative history is another factor upon which the Defendants rely in support of their motion. As the government points out, resort to the legislative history is probably not appropriate in this case because the plain meaning of the statute resolves the question. Under normal principles of statutory construction, the plain meaning should control "unless the statutory language can lead to more than one reasonable interpretation." *Pearson,* 274 F.3d at 1231 (citation omitted). Where there is more than one reasonable interpretation, a court may look to legislative history to resolve the question. *Id.* However, because the panel in *Pearson* went on to cite legislative history even after deciding that the plain meaning of the statute resolved the question, 274 F.3d at 1232, the Defendants' arguments based on legislative history are considered here.

The Defendants rely primarily on the Senate Conference Report for the 1990 Clean Air Act amendments. Writing about the proposed amendments to § 7413 contained in Senate bill (S.1630), the Senate conferees stated, "The Senate bill provides criminal fines and penalties for the following actions ... (ii) the negligent or knowing release into the air of any hazardous air pollutant that exceeds a standard or limitation under the Act and endangers others...." S. Prt. No. 103–38(I) (1993), *reprinted in* Legislative History of Clean Air Act Amendments of 1990, at 940 (1993). Of the House amendment (H.R. 3030), the conferees wrote, "The House amendment provides criminal fines and penalties for the following actions ... (ii) the negligent or knowing release into the

ambient air of any hazardous pollutant that exceeds a standard or limitation under the act and endangers others...." *Id.* The Defendants argue the Conference Report makes clear Congress' intent for violation of a regulatory standard to be an element of the knowing endangerment offense.

However, as the government correctly contends, the language of S. 1630 and H.R. 3030 does not entirely support the summary prepared by the Senate conferees in that neither proposal states that violation of an emissions standard is an element of the offense. The Senate committee report summarized the knowing endangerment provision of S. 1630 as follows:

> [T]he bill provides that any person who knowingly releases into the air any hazardous air pollutant listed under [§ 7412], or any extremely hazardous substance listed pursuant to 42 U.S.C. 11002(a)(2), and "who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury" shall be subject to more severe criminal penalties.... A knowing release of these pollutants does not constitute a violation under this provision if the release does not violate an emission standard that has been set *for that pollutant.*

S.Rep. No. 101–228, at 359–360 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3385, 3742–3743 (emphasis added). The language of the senate committee report makes clear that the exception to liability applies only when the release of a pollutant does not violate an emission standard *that exists for that pollutant.* If no emis-

---

person endangered and was a reasonably foreseeable hazard of employment or medical treatment. 42 U.S.C. § 7413(c)(5)(C). However, affirmative defenses to knowing endangerment are also discussed in § 7413(c)(5)(D) and § 7413(h), which provides an affirmative defense for non-management employees carrying out normal activi-

ties and acting on orders from an employer. It is clear from these provisions that Congress did not intend for all affirmative defenses to be grouped under the same subparagraph. *See Pearson,* 274 F.3d at 1232 (rejecting the argument that Congress intended all affirmative defenses to be confined to 42 U.S.C. § 7413(c)(5)(C)).

sion standard exists for the pollutant released, it must follow that there is no affirmative defense available in such a case. If the Senate had intended that there be no criminal liability in such a case, it could have written, "A knowing release of these pollutants does not constitute a violation under this provision if the release does not violate an emission standard." The addition of the phrase "that has been set for that pollutant" suggests that the Senate did not intend to limit the statute to releases of only those pollutants for which emissions standards have been set.

The House committee report accompanying H.R. 3030 similarly provides, "If *in the case of an air pollutant for which EPA has set an emission standard* or issued a permit under Title IV, the release, in accordance with the standard or permit, shall not constitute a violation with subparagraph (4) or this paragraph." H.R. Rep. No. 101–490(I), at 393 (1990) (emphasis added). The passage establishes a proviso applicable only in the case of an air pollutant for which EPA has set a standard, but it does not suggest that the statute is limited to such cases.

The Defendants also note the conferees' statement in the Conference Report that the criminal provisions of § 7413(c) of the Clean Air Act "are largely modeled upon those contained in the [Clean Water Act (CWA)] and [the Resource Conservation and Recovery Act (RCRA)], and we expect them to operate in the same fashion as those have operated." S. Prt. No. 103–38(I) (1993), *reprinted in* Legislative History of Clean Air Act Amendments of 1990, at 941 (1993). The Defendants claim that "the 'fashion' in which the knowing endangerment provisions of the Clean Water Act and RCRA 'operate' is to permit prosecution only where there is a breach of a civil regulatory standard." Defs.' Op. Br. at 11–12. The Defendants fail to acknowledge a clear distinction between the Clean Air Act on one hand and the CWA and RCRA on the other: While the Clean Air Act's knowing endangerment provision as written refers to regulatory violation as an exception, both the CWA and RCRA explicitly establish regulatory violation as an element. *See* 42 U.S.C. § 6928(e) (RCRA), 33 U.S.C. § 1319(c)(3)(A).[26] The Defendants are able to cite many cases featuring prosecutions under the CWA and RCRA in which the government has alleged a regulatory breach in the indict-

---

26. The RCRA's knowing endangerment provision states:

Any person who knowingly transports, treats, stores, disposes of, or exports any hazardous waste identified or listed under this subchapter or used oil not identified or listed as a hazardous waste under this subchapter *in violation of paragraph (1), (2), (3), (4), (5), (6), or (7) of subsection (d) of this section* who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment for not more than fifteen years, or both. A defendant that is an organization shall, upon conviction of violating this subsection, be subject to a fine of not more than $1,000,000.

42 U.S.C. § 6928(e) (emphasis added). The CWA's knowing endangerment provision reads:

Any person who knowingly *violates section 1311, 1312, 1313, 1316, 1317, 1318, 1321(b)(3), 1328, or 1345 of this title*, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator or by a State, or in a permit issued under section 1344 of this title by the Secretary of the Army or by a State, and who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment of not more than 15 years, or both.

33 U.S.C. § 1319(c)(3)(A) (emphasis added).

ment but the distinction observed here renders the authority not very helpful. It is also telling that the Defendants have not cited a case in which a court has held a regulatory violation to be an element of knowing endangerment under the Clean Air Act. Regardless of the stated intentions of the conferees in the Conference Report, the statutory language of the Clean Air Act's knowing endangerment provision is substantially different from that of corresponding provisions in the CWA and RCRA, which renders the force of the Defendants' argument by analogy minimal.

The legislative history is at best inconclusive and provides no support for disregarding the plain meaning of the statute as written.

The Defendants' final argument is that the emissions clause should be an element because the government can meet the burden of proof much more easily than can the Defendants. In making their argument the Defendants mistakenly rely upon the timing and nature of the asbestos releases charged in this case. Defs.' Op. Br. at 17. Because this is a motion to dismiss, the relative burdens of proof should be weighed in light of the offense as written, not the offense charged. *See Boren,* 278 F.3d at 914. There is not a significant difference between the burden to prove that a release violated a regulatory standard (if the government has the burden) and the burden to prove that a release did not violate the standard (if the burden is the defendant's). In any event it is not the case that the burden on the defendant would be "overbearing," to use the Ninth Circuit's term in *Gravenmeir.* 121 F.3d at 528. There is nothing in the comparative difficulty of the burdens to suggest that the emissions clause should be viewed as an element.

The plain language of the Clean Air Act's knowing endangerment provision means that the emissions clause establishes an affirmative defense to the offense of knowing endangerment. Neither the legislative history nor an analysis of the comparative burdens indicates that Congress intended for knowing endangerment to include a regulatory violation as an element. The motion to dismiss Counts II through IV for failure to allege breach of an emissions standard is denied.

**D. Defendants Grace, Stringer, Wolter and Bettacchi's motion to dismiss Counts II through IV of the Indictment for failure to sufficiently apprise the Defendants of the nature of the offense charged**

Defendants Grace, Stringer, Wolter and Bettacchi move to dismiss Counts II through IV of the Indictment for failure to sufficiently apprise the Defendants of the nature of the offense charged. Defendants argue that the counts violate the Sixth Amendment because they are impermissibly vague and rely on an erroneous definition of "tremolite" and "tremolite asbestos." Counts II through IV each incorporate Paragraphs 1 through 69 and 84 through 184 of the Indictment. Paragraph 4 of the Indictment states:

> The vermiculite deposits at the Libby Mine were contaminated with amphibole asbestos.[27] The amphibole asbestos found at the Libby Mine is composed of a family of closely related minerals including tremolite, winchite, richterite, actinolite and others. This amphibole asbestos has been commonly called "tremolite" and, for the purposes of this Indictment, it will be referred to as "tremolite," "tremolite asbestos" and "amphibole asbestos."

---

27. Asbestos is a hazardous air pollutant for purposes of the Clean Air Act's knowing endangerment provision. *See* 42 U.S.C. §§ 7413(c)(5)(A), 7412(b)(1).

Defendants argue that the explanation provided in Paragraph 4 renders the Indictment impermissibly vague because it leaves them to guess as to whether Counts II through IV (which allege a release of "asbestos") charge them with releasing tremolite, winchite, richterite, actinolite or some other substance.[28] Defendants also claim to have to guess as to which of those minerals is alleged to have caused the endangerment charged in Counts II through IV. The Defendants contend that this lack of specificity is fatal to Counts II through IV and that those counts should be dismissed.

**1. Legal standard**

 "[A]n indictment is sufficient if: (1) it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend; and (2) it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hill,* 279 F.3d at 741. A motion alleging a defect in the indictment must be made before trial. Fed.R.Crim.P. 12(b)(3)(B). When reviewed for sufficiency an indictment must be read in its entirety, construed according to common sense, and read to include facts which are necessarily implied. *United States v. Anderson,* 532 F.2d 1218, 1222 (9th Cir.1976). In deciding a motion to dismiss, a court should not consider evidence not appearing on the face of the indictment. *Boren,* 278 F.3d at 914. These standards have been discussed and applied above.

**2. Discussion**

 The Defendants claim Counts II through IV are impermissibly vague because they do not specify (1) what air pollutant the Defendants are charged with

releasing and (2) what air pollutant is alleged to have endangered another person. The Defendants' professed confusion is based on Paragraph 4 of the Indictment, which states that the Indictment will alternatively use the terms "tremolite," "tremolite asbestos," and "amphibole asbestos" to describe the contaminant found in the Libby vermiculite deposits. Paragraph 4 defines the contaminant as being "composed of a family of closely related minerals including tremolite, winchite, richterite, actinolite and others." Counts II through IV charge that the Defendants released "asbestos" knowing that the release placed another person in imminent danger. The Defendants contend that Counts II through IV, when read in conjunction with Paragraph 4, leave it unclear as to whether the Defendants are charged with releasing winchite, richterite, tremolite, actinolite, or some other mineral. Thus, the vagueness Defendants identify relates to the description of the hazardous air pollutant released.

The Defendants analogize their position to that of the defendants in *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). In *Russell,* the Defendants were convicted of violating 2 U.S.C. § 192, which makes it a misdemeanor to refuse while testifying before a congressional subcommittee to answer questions "pertinent to the question under inquiry." *Id.* at 752, 82 S.Ct. 1038. The Defendants appealed, arguing that the indictments against them were unconstitutionally vague because they failed to state what was the question under inquiry when the alleged refusal to answer occurred. *Id.* The Supreme Court reversed the convictions, holding that the indictments violated the Sixth Amendment because they

---

**28.** As is discussed in greater detail below, the Defendants contend that neither winchite nor richterite qualifies as a "hazardous air pollu-

tant" for purposes of the Clean Air Act's knowing endangerment provision.

failed to "apprise the defendant 'of what he must be prepared to meet.'" *Id.* at 764, 82 S.Ct. 1038. The Court explained that "the core of criminality [under the statute] is pertinency to the subject under inquiry of the questions which the defendant refused to answer." *Id.* Without knowing the subject under inquiry, the defendants were forced "to go to trial with the chief issue undefined." *Id.* at 766, 82 S.Ct. 1038.

The Defendants contend that Counts II through IV similarly leave the "chief issue," i.e., the nature of the hazardous air pollutant released, undefined. The plain language of the Indictment belies the Defendants' contention. Rather than leaving the issue undefined, Paragraph 4 of the Indictment expressly defines the nature of the asbestos alleged to contaminate Libby vermiculite. It is alleged to be "composed of a family of closely related minerals including tremolite, winchite, richterite, actinolite and others."[29] The Defendants apparently read Paragraph 4 to state that any one of the minerals listed therein is "asbestos," such that subsequent references to asbestos in the Indictment may refer to any one of those distinct minerals. A more faithful reading of Paragraph 4 is that the term "asbestos" for purposes of the Indictment refers to a composite of tremolite, winchite, richterite, actinolite and other minerals, that it is this composite that the Defendants are alleged to have released in Counts II through IV, and that it is this composite that is alleged to have caused endangerment. On a fair reading of the Indictment, there is nothing vague about the description of the hazardous air pollutant allegedly released and the Defendants are fully aware of what they must be prepared to meet.

The Defendants attempt to imply some deficiency in Counts II through IV based on their claim that two of the minerals listed in Paragraph 4, winchite and richterite, are not included within the Clean Air Act's definition of asbestos. The Defendants contend that the Clean Air Act relies upon the definition of asbestos codified at 40 C.F.R. § 61.141 (2005), which defines asbestos as "the asbestiform varieties of serpentinite (chrysotile), riebeckite (crocidolite), cummingtonite-grunerite, anthophyllite, and actinolite-tremolite." The government disagrees, arguing that a more expansive definition of asbestos applies for purposes of the knowing endangerment provision. It is unnecessary to resolve the dispute at this stage because the definition favored by the Defendants lends no force to their argument for dismissal.

Assuming that the definition of asbestos in 40 C.F.R. § 61.141 applies, two of the minerals listed in Paragraph 4 (tremolite and actinolite) are asbestos while two (winchite and richterite) are not. But this does not change the fact that the Indictment as written alleges that the Defendants caused the release of a composite of all four minerals, among others, including two which the Defendants concede are asbestos. The Defendants complain that the Indictment "fails to link the regulated substances—and only those substances—to the alleged harm." Defs.' Op. Br. at 17. But there is no requirement that the government allege that the Defendants released pure asbestos, or that they released asbestos and nothing more. The government must allege a knowing release of asbestos that the Defendants knew placed another person in

---

29. Paragraph 4 provides that the asbestos defined therein will be referred to throughout the Indictment as "tremolite," "tremolite asbestos," and "amphibole asbestos." Counts II through IV, on the other hand, describe the hazardous air pollutant released simply as

"asbestos." Both parties ignore the technical discrepancy and assume that Counts II through IV refer to the material described in Paragraph 4; this Order makes the same assumption.

danger. Even though the government provided greater detail by describing all of the minerals making up the contaminant in Libby vermiculite, that is not a basis for finding the charges impermissibly vague.

The Defendants contend that the definition of asbestos is important because the government's expert witness disclosure of Gregory P. Meeker indicates that the Libby amphibole at issue is comprised of 84% winchite, 11% richterite and only 6% tremolite. The implied argument is that the charged releases may not include tremolite or any other material defined as asbestos. The point fails to advance the Defendants' position. As noted above, it is improper to consider evidence outside the indictment in deciding a motion to dismiss. *See Boren,* 278 F.3d at 914. The Defendants' reliance on the government's expert report invites the Court to prematurely rule on the sufficiency of the evidence, a matter that should be left for the jury to decide at trial. *See United States v. Nukida,* 8 F.3d 665, 669–70 (9th Cir.1993). The reference to the government's expert report simply raises the possibility that the proof at trial might show that the substance released does not contain any mineral defined as asbestos. That possibility has no bearing on the Indictment, which clearly alleges that the contaminant found in Libby vermiculite and released in Counts II through IV includes minerals that fit the definition of asbestos, which in turn is a hazardous air pollutant for purposes of the Clean Air Act's knowing endangerment provision. That allegation must be proved at trial. It need not be proved now. The motion to dismiss Counts II through IV for failure to sufficiently apprise the Defendants of the nature of the offense charged is denied.

**E. Defendant Grace's motion to dismiss Counts II through IV of the Indictment on statute of limitations and duplicity grounds**

Grace argues that all conduct charged in the Clean Air Act counts occurring prior to November 3, 1999 [30] is time-barred by the five-year statute of limitations applicable to criminal violations of the Clean Air Act.[31] With respect to the portions of Counts II through IV that would remain if Grace prevailed on its statute of limitations argument, Grace moves to dismiss those counts as duplicitous. The counts are duplicitous, according to Grace, because they charge more than one release of asbestos, and therefore more than one offense, in each count. The United States argues that the statute of limitations is not a bar to prosecution for conduct occurring prior to November 3, 1999 because the knowing endangerment with which Grace is charged in Counts II through IV is a continuing offense. The government says the counts are not duplicitous, and that any danger arising from the possibility of a non-unanimous verdict can be cured through jury instructions at trial.

**1. Statute of limitations**

**a. Legal standard**

▮▮▮▮▮ A statute of limitations generally begins to run when all the elements constituting the offense are complete. *Toussie v. United States,* 397 U.S. 112,

---

30. Beginning on November 3, 2004, the Defendants entered into three tolling agreements with the United States Attorney's Office that extended the statute of limitations for a total of 97 days, until the filing of the Indictment on February 7, 2005. As a result, the limitations period applicable to this case began on November 3, 1999.

31. Because the Clean Air Act's knowing endangerment provision does not contain its own statute of limitations, the offense carries the five-year statute of limitations generally applicable to non-capital federal criminal offenses. *See* 18 U.S.C. § 3282(a).

115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). Thus, conduct constituting a completed offense which falls outside the applicable limitations period may not be prosecuted unless the crime is determined to be a continuing offense.[32] *Id.* In light of the purposes of a statute of limitations, which include protection against prosecution for acts done in the distant past and insurance against loss of evidence due the passage of time, the continuing offense doctrine applies only in rare circumstances. *Id.* ("[T]he tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends that statute beyond its stated term." (quoting lower court opinion)). For that reason, the Supreme Court held that an offense is a continuing one only if (1) the explicit language of the substantive criminal statute compels such a conclusion, or (2) the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one. *Id.*

■ The five-year statute of limitations applicable to the knowing endangerment provision of the Clean Air Act, 42 U.S.C. § 7413(c)(5), means that all of the criminal conduct charged in Counts II through IV occurring prior to November 3, 1999 is barred from prosecution unless the crime set forth in § 7413(c)(5) is a continuing offense. There is no explicit indication in the text of § 7413(c)(5) that Congress intended for knowing endangerment to constitute a continuing offense. Accordingly, the conduct prior to November 3, 1999 is time-barred unless the Court finds that the nature of the offense is such that Congress "must assuredly" have intended that

it be treated as continuous. *Toussie,* 397 U.S. at 115, 90 S.Ct. 858.

The Supreme Court faced a similar inquiry in *Toussie.* There, the defendant was charged with violating a statute requiring all male citizens between ages 18 and 26 to register for military service at the time and place dictated by the president. The applicable presidential proclamation required a male citizen to register within five days after his eighteenth birthday. *Id.* at 113, 90 S.Ct. 858. The defendant failed to register upon turning 18, and was charged with violating the registration statute more than seven years later, at the age of 25. The defendant argued that the five-year statute of limitations had run because the offense was complete upon his failure to register within five days after his eighteenth birthday. The government argued that the statute articulated a continuing offense, such that the crime was ongoing as long as the defendant remained unregistered but subject to the obligation to register.

The Supreme Court concluded that Congress had not "assuredly" intended for the offense to be continuous. *Id.* at 122–23, 90 S.Ct. 858. The Court based its decision in part upon the history of the registration process, which the Court interpreted to include a general understanding that registration was a discrete act to be completed on a designated date, and that failure to so comply at the set time constituted a single offense. *Id.* at 116–19, 90 S.Ct. 858. The Court also examined the language of the statute, finding nothing that "clearly contemplates a prolonged course of conduct." *Id.* at 120, 90 S.Ct. 858. Finally, the Court

---

32. A continuing offense is an offense that perdures beyond the initial illegal act. *See United States v. Yashar,* 166 F.3d 873, 875 (7th Cir.1999). Examples of continuing offenses include conspiracy, kidnaping and bigamy.

*See, e.g., Toussie,* 397 U.S. at 122, 90 S.Ct. 858 (conspiracy); *United States v. Garcia,* 854 F.2d 340, 343–44 (9th Cir.1988) (kidnaping); *Ex Parte Snow,* 120 U.S. 274, 281–82, 7 S.Ct. 556, 30 L.Ed. 658 (1887) (bigamy).

considered the nature of the crime involved, and determined that there is "nothing inherent in the act of registration itself which makes failure to do so a continuing crime." *Id.* at 122, 90 S.Ct. 858. The Court concluded that the offense should not be treated as continuing absent a more definitive statement of Congress' intent to the contrary:

> [W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication.

*Id.* at 122, 90 S.Ct. 858 (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22, 73 S.Ct. 227, 97 L.Ed. 260 (1952)).

Grace argues that the same reasoning applies to the knowing endangerment provision of the Clean Air Act. In furtherance of its argument, Grace contends that the Court's analysis should ignore the particular facts of the crimes charged in Counts II through IV and focus solely on the nature of the statutory offense as written. In other words, in deciding whether the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one, Grace urges the Court to consider only the offense as written in § 7413(c)(5), and not the offenses charged in this case. The Supreme Court in *Toussie* did not expressly forbid courts from considering the facts of the case at issue in deciding whether an offense should be deemed continuing. Other courts, however, have identified compelling reasons to adopt the position advocated by Grace.

In *Yashar*, 166 F.3d at 875, the defendant was charged with embezzlement of more than $5,000.00 during the one-year period from September 1, 1991 to September 1, 1992. Because of a partial statute of limitations waiver, the effective date of his indictment was August 13, 1997. The defendant moved to dismiss on statute of limitations grounds because the indictment did not allege that he stole the requisite amount of $5,000.00 during the period from August 13, 1992 to September 1, 1992, and that any conduct earlier than August 13, 1992 was time-barred by the five year statute of limitations. *Id.* at 875. The government conceded that the offense was not a "continuing offense" under the *Toussie* test, but argued that the statute of limitations should not apply because the defendant's conduct was permissibly charged as one "course of conduct" offense with some of the conduct falling within the limitations period. *Id.* at 876. Under the government's argument in *Yashar*, if the prosecutor charges an offense as an ongoing course of conduct, the offense is complete for statute of limitations purposes not when all required elements are first met, but rather when the criminal conduct ceases.

The *Yashar* panel rejected the government's argument as an improper effort to shift the focus of the *Toussie* test away from Congress' intent and onto the specific offense charged in each case:

> *Toussie* extends the limitations period only in cases in which Congress explicitly defines an offense as continuing, or in which the crime by its nature is such that Congress must have intended it to be considered continuing. The government would add to those factors a third one, which is whenever the *charged conduct* is continuous in nature. That would largely swallow the second factor of *Toussie*, which focuses on whether the crime by its nature is such that Congress must have intended that it be treated as a continuing one, and would eviscerate its narrow, selective ap-

proach. The focus would no longer be on Congress' wording and intent, but on the conduct charged by the prosecutor and the language of the indictment in a particular case. If the charged conduct was continuous, the court would no longer care if the statute itself delineated conduct that was continuous in nature. We reject this approach as inconsistent with *Toussie* as well as other cases, and as contrary to the purpose of the statute of limitations.

*Id.* at 877.

The Ninth Circuit has not spoken clearly on whether the *Toussie* analysis permits a court to refer to the nature of the conduct charged in addition to the nature of the conduct prohibited by the statute. In *United States v. Morales,* 11 F.3d 915 (9th Cir.1993), the defendant was charged in a single count with accepting bribes which occurred both before and after the effective date of the United States Sentencing Guidelines. The defendant made an *ex post facto* challenge to his Guidelines sentence, arguing that pre-Guidelines conduct could not form the basis of an enhancement under the Guidelines. *Id.* at 917. The court rejected the argument based on its view that the "offense" for purposes of the bribery conviction was the entire scheme, encompassing all bribes received both before and after the effective date of the Guidelines, such that the offense was not completed until after the Guidelines became effective. *Id.* The dissent argued that the majority's view ran afoul of *Toussie* because bribery is not a continuing offense. *Id.* at 919 (O'Scannlain, J., dissenting). The majority countered that *Toussie's* continuing offense doctrine only applies "where it is *contended* that the actual conduct of the defendant ended but the crime continued past that time." *Id.* at 918 (emphasis added). The majority's use of the word "contended" suggests that the majority views the *Toussie* test as relying on what the government has charged rather than on what the substantive statute says.

The Ninth Circuit endorsed the opposite approach in *United States v. Niven,* 952 F.2d 289, 293 (9th Cir.1991), *overruled on other grounds by United States v. Scarano,* 76 F.3d 1471, 1477 (9th Cir.1996). In *Niven,* the defendant was convicted of mail and wire fraud occurring before and after the effective date of the Guidelines, and was sentenced separately for his pre-Guidelines conduct. *Id.* at 291. The defendant argued that his mail and wire fraud offense were continuing, and thus completed after the effective date of the Guidelines, meaning he should have been sentenced entirely within the Guideline structure. *Id.* at 293. Relying on *Toussie,* the court wrote:

> An offense should not be deemed continuous "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." As this passage makes clear, the analysis turns on the nature of the substantive offense, not on the specific characteristics of the conduct in the case at issue.

*Id.* (citing *Toussie,* 397 U.S. at 115, 90 S.Ct. 858) (citation omitted).

The Ninth Circuit cases do not provide clear guidance in this instance. *Niven's* statement that the analysis turns on the nature of the substantive offense is muddled by the subsequent implication in *Morales* that *Toussie's* application is dependent on the nature of the government's contention in a given case. The picture is further obscured by the fact that neither case addresses the *Toussie* test in the statute of limitations context, but rather both deal with the Guidelines. Without a clear directive, following the more sensible approach adopted by the Seventh Circuit

in *Yashar* and the Ninth Circuit in *Niven* is the logical path to take. The goal of the *Toussie* test is to ascertain what Congress "must assuredly have intended" with respect to the application of the statute of limitations; there is nothing about the specific conduct charged in a given case that could possibly shed light on Congress' intent. To the contrary, as the *Yashar* court observed, reference to the nature of the offense charged creates the possibility that the intent of Congress may be obscured by a prosecutor's charging decision.

In examining the nature of the offense to determine whether Congress most assuredly intended that it be treated as continuing, the Court looks only to the substantive offense criminalized in the Clean Air Act's knowing endangerment provision, and not to the specific conduct charged in Counts II through IV.

### b. Did Congress intend knowing endangerment to be a continuing offense?

 The government argues that the nature of knowing endangerment makes it a continuing offense for two reasons. First, the government contends that the crime of knowing endangerment is not complete until the endangerment ceases. Second, the government argues that the legislative history of the Clean Air Act demonstrates that Congress intended the word release to "pertain to continuing emissions under the [Clean Air Act] as long as they persist." Govt.'s Op. Br. at 4. Neither argument compels the conclusion that Congress "must have assuredly intended" for knowing endangerment to constitute a continuing offense.

The government's first argument, i.e., that the offense of knowing endangerment is not completed until the endangerment

caused by the release ceases, is not a basis for finding that Congress intended to establish a continuing offense. The most obvious reason why this is so is that the government's argument attempts to do precisely what the court rejected in *Yashar*: the government is assessing the nature of the statute in terms of the conduct charged, not the offense criminalized in the statute. While the endangerment charged in Counts II through IV is ongoing, there is nothing inherent in the concept of endangerment as set forth in § 7413(c)(5) that requires that endangerment take place over time.[33] It is conceivable that a person might release a pollutant into the air and thereby immediately endanger another person, but that the period of endangerment may be very short. The mere fact that endangerment is an element of the offense and that endangerment could in some cases, such as is charged in this case, endure for a lengthy period does not compel the conclusion that Congress intended the knowing endangerment offense to be continuing.

Moreover, the government is incorrect in its contention that the crime of knowing endangerment is not complete until the endangerment ceases. Section 7413(c)(5) criminalizes any release of a pollutant when the releasing party knows at the time that he thereby places another person in imminent danger of death or serious bodily injury. Assuming all other elements are satisfied, the crime defined in that section is complete and may be prosecuted at the first instant that another person is placed in imminent danger, regardless of how long the endangerment lasts. In support of its contention that the crime is not compete until the endangerment ends, the government says that knowing

---

**33.** For this reason, I reject the government's argument that for purposes of this case the term "imminent" as used in § 7413(c)(5) is synonymous with "ongoing." *See* Govt.'s Resp. Br. at 10.

endangerment is a "crime of consequence," and cites the following passage written by Judge Learned Hand:

> In short, if the crime, as homicide, be defined to include some consequences of the act, it may be argued and has been generally decided that the crime takes place only where the consequences occur. The crime is the consequence when produced by human agency whether near or far. But where the crime covers only the conscious act of the wrongdoer, regardless of the consequences, the crime takes place only where he acts.

*Daeche v. United States*, 250 F. 566, 570 (2d Cir.1918) (citation omitted). The passage, though accurate, does not advance the government's contention. To the contrary, the passage confirms that the crime takes place when the consequence (i.e., endangerment) occurs, not when it stops occurring. Just because endangerment may occur over time does not mean that it must do so. There is nothing inherent in the element of endangerment which requires that it be viewed as a continuing offense.[34]

The government's arguments from the Clean Air Act's legislative history are similarly unconvincing. The argument begins by claiming that the term "release" as used in § 7413(c)(5) refers to an ongoing release because "release" is synonymous with "emission." The claim is based on the legislative history of the Clean Air Act and the definitional provisions of § 7412(r)(2)(A), which define "accidental release" as an "unanticipated emission." The government then argues that "the term 'emit,' and therefore 'release,' signify a passive 'giving off' of airborne particulates." Govt.'s Resp. Br. at 12. Assuming the government is correct that "release" is synonymous with "emission," there is no persuasive force to the contention that "emission" refers to an ongoing release as opposed to a discrete discharge. Both "release" and "emission" are general terms that do not by themselves carry any particular connotation with regard to duration of the event.

The government next attempts to adopt CERCLA's definition of "release" for purposes of the Clean Air Act. It does so by arguing that the Clean Air Act's legislative history shows that § 7412(r)(9)—which is distinct from the knowing endangerment provision at issue here—was patterned after § 106 of CERCLA, 42 U.S.C. § 9606. CERCLA, in turn, defines "release" as "[a]ny spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment.…" 42 U.S.C.

---

**34.** The government argues that Congress must have intended the statute of limitations to run only upon cessation of the endangerment because such a system would encourage wrongdoers to come forward. As the government puts it,

> Pegging that statute of limitations to the initial release would encourage a defendant to remain quiet until the limitations period had passed. Conversely, construing the ongoing releases to be a continuing violation would provide the defendant with an incentive to reveal the contamination and thereby lessen his liability.

Govt.'s Resp. Br. at 8–9.

There are two flaws with the government's argument. First, the running of the statute of limitations under § 7413(c)(5) is not "pegged" to the release, but rather to the completion of the final element, which must in every case be endangerment. More importantly, the government's position would not encourage wrongdoers to come forward. To the contrary, if the statute of limitations does not begin to run until endangerment ends, the incentive for a defendant is to cover up the endangerment indefinitely, not to go public for purposes of abating the endangerment. Under the scheme advocated by the government, a defendant who comes clean would subject himself to the risk of prosecution for the next five years. A defendant would not lessen his liability by revealing the contamination; he would guarantee it.

§ 9601(22). The government then cites a Sixth Circuit case, *United States v. 150 Acres of Land*, 204 F.3d 698, 706 (6th Cir.2000), for the proposition that disposal and release mean different things: " '[D]isposal' means the initial discharge of a pollutant, and 'release' encompasses passive migration." Govt.'s Resp. Br. at 13. The government cannot have it both ways. If it wishes to incorporate CERCLA's definitional provisions into § 7413(c)(5) by way of § 7412(r)(9), then it must at least adhere to those provisions. Under section 101(22) of CERCLA, every disposal is a release. So while "release" may include events other than disposal, the government cannot define the two terms as distinct while remaining faithful to its claim that CERCLA's definition of "release" controls. The result is that the government has demonstrated that "release" can describe any number of events some which seem by their nature to be discrete (e.g., "disposing," "spilling," "emptying,"), and some of which could be ongoing (e.g., "leaking," "escaping"). Thus, even if the Court assumes that adopting CERCLA's definition of "release" is proper for Clean Air Act purposes, there is nothing in that definition to suggest that Congress must have intended "release" to be an ongoing event.

As in *Toussie*, 397 U.S. at 122, 90 S.Ct. 858, the government's argument for implying a continuing offense in this case is at best highly equivocal. In such a case, the important considerations underlying statutes of limitations dictate that the Court refrain from inferring a continuing offense where Congress has failed to speak clearly on the matter. *Toussie*, 397 U.S. at 115, 90 S.Ct. 858. Accordingly, Grace's motion to dismiss is granted as to all Defendants with regard to the criminal conduct charged in Counts II through IV which was complete as of November 3, 1999.

### 2. Duplicity

#### a. Legal standard

An indictment is duplicitous where a single count joins two or more distinct offenses. *Ramirez–Martinez*, 273 F.3d at 913. The requirement that multiple offenses be charged in separate counts is intended to eliminate the constitutional problems created when two or more offenses are joined in a single count. "A duplicitous indictment compromises a defendant's Sixth Amendment right to know the charges against him, as well as his Fifth Amendment protection against double jeopardy." *King*, 200 F.3d at 1212. A duplicitous indictment also carries with it the risk of a non-unanimous verdict on the duplicitous count. *Aguilar*, 756 F.2d at 1420 n. 2. In deciding whether an indictment is duplicitous, "[t]he court limits its review to a reading of the indictment itself to determine whether it may be read to charge a single violation." *King*, 200 F.3d at 1212 (citing *Aguilar*, 756 F.2d at 1422).

Once duplicity is established, a trial court may (1) allow election, provided the defendant is not prejudiced thereby and the election does not alter the nature of the charge, or (2) dismiss the offending count. *Aguilar*, 756 F.2d at 1423. Another option is to address the duplicitous indictment by instructing the jury that all members are required "to agree as to which of the distinct charges the defendant actually committed." *Ramirez–Martinez*, 273 F.3d at 915. Grace seeks dismissal of Counts II through IV in their entirety.

#### b. Discussion

Grace argues that the remaining charges in Counts II through IV (charging knowing endangerment violations completed after November 3, 1999) are duplicitous because each count charges more than one release of asbestos without providing adequate notice of each release. Grace then

argues that the duplicity in Counts II through IV is worrisome for several reasons, most notably the lack of notice with respect to the charges and the possibility of a non-unanimous jury verdict. Grace's concerns have already been raised in its earlier motion for a bill of particulars. In ruling on that motion, the Court concluded that, with regard to Counts II through IV, the Indictment "puts the Defendants on notice of the charges and allows them to prepare an adequate defense." *United States v. W.R. Grace*, 401 F.Supp.2d 1103, 1111 (D.Mont.2005). The Court also concluded that the Clean Air Act counts create no risk of double jeopardy. *Id.* at 1112–13.

That leaves the concern over the possibility of a non-unanimous jury verdict, a concern that is, at this stage of the case, premature. Grace by its motion has objected to the form of the Indictment as duplicitous. If the Court finds that the form of the Indictment is proper, the case can go forward without injury to the Defendants' constitutional rights because the proper presentation of the charge is all that is required at this stage. If the proof at trial demonstrates a risk that jurors might convict without agreeing as to all elements of the Clean Air Act counts, the Court can then take steps to protect the Defendants from the risk of a non-unanimous verdict. Such steps might include curative instructions to the jury, special interrogatories to insure unanimity, or the dismissal of all or part of the offending count.

Counts II through IV are not duplicitous because, while they appear to be intended to charge more than one offense in each count, they can be read to charge only one offense in each count. Moreover, even if the counts are deemed duplicitous, it is within the Court's discretion to address the duplicitous charge by instructing the jury that all members are required "to agree as to which of the distinct charges the defendant actually committed." *Ramirez–Martinez*, 273 F.3d at 915. Because the Court has already concluded that the other dangers associated with duplicitous pleading are not present in this case, the case will proceed to trial on what remains of Counts II through IV; any concerns over jury unanimity may be addressed as they arise.

Grace's motion to dismiss is granted as it relates to the illegal conduct charged in Counts II though IV which was complete as of November 3, 1999. The motion to dismiss the remainder of Counts II though IV as duplicitous is denied.

### F. Defendants Grace, Stringer, Wolter and Bettacchi's motion to dismiss Counts V and VI for failure to state an offense

■ Defendants Grace, Stringer, Wolter and Bettacchi move to dismiss Counts V and VI (the wire fraud counts) for failure to state an offense. The government has responded by filing its own motion to dismiss Counts V and VI without prejudice for failure to allege an essential element, i.e., materiality of the schemes to defraud charged in those counts. "[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." *Neder v. United States*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). "As such, materiality must be alleged in the indictment." *United States v. Omer*, 395 F.3d 1087, 1089 (9th Cir.2005), *reh'g denied*, 429 F.3d 835 (9th Cir.2005). Materiality is not alleged in either of Counts V and VI.

Failure to allege a required element of the charged offense is a fatal flaw requiring dismissal. *Du Bo*, 186 F.3d at 1179. Rule 48(a), Fed.R.Crim.P., allows the government to dismiss all or part of an indictment upon leave of court. Dismissal un-

der Rule 48(a) is without prejudice unless the court finds that the dismissal is sought for some improper purpose. *United States v. Brown*, 425 F.3d 681 (9th Cir. 2005) (per curiam); 3B Charles Alan Wright, Federal Practice and Procedure: Federal Rules of Criminal Procedure § 811 (3d ed. Supp.2005).

Defendants argue for the dismissal of Counts V and VI with prejudice because of "the government's intentional and prejudicial delay in seeking dismissal." Defs.' Reply Br. at 5. The delay is intentional, according to the Defendants, because the Ninth Circuit's decision in *Omer* came down January 19, 2005, more than two weeks before the Indictment was filed in this case.[35] The Defendants contend that the government should have amended or removed the wire fraud counts in light of the *Omer* decision prior to filing the Indictment on February 7, 2005. The Defendants argue that the delay is prejudicial because it represents a "strategic effort to secure more time to respond to the defendants' argument (and thereby manipulate the Court's scheduling order) and to allow less time for the defendants to respond to and prepare for the charges they will face at trial." Defs.' Reply Br. at 5–6. Also, the Defendants fear that amended wire fraud charges may require more discovery and force them to commit resources to responding to the new charges instead of trial preparation.

The Defendants' arguments for dismissal with prejudice are weak. There is no evidence of improper motive or bad faith on the part of the government, and no apparent strategic benefit to the government in dismissing the wire fraud charges at this point. Should the government choose to bring new wire fraud charges free from defect, a course which would require presentation of the entire case to a new grand jury, it is doubtful the Defendants will be prejudiced by the new charges, as the amendments are likely to be confined to the addition of an allegation of materiality.

Accordingly, the government's motion to dismiss Counts V and VI pursuant to Rule 48(a), Fed.R.Crim.P., is granted, and Counts V and VI are dismissed without prejudice. The Defendants' motions to dismiss the same counts for failure to state an offense are denied as moot.

## IV. Order

Based on the foregoing, IT IS HEREBY ORDERED:

(1) Defendants' joint motion pursuant to Rule 8(a), Fed.R.Crim.P., to dismiss Count I of the Indictment as duplicitous (dkt # 248) is DENIED;

(2) Defendants' joint motion pursuant to Rule 7(c), Fed.R.Crim.P., to dismiss Counts I through IV of the Indictment for failure to allege a required element, i.e., that the Defendants were aware that their conduct in violation of the Clean Air Act was unlawful (dkt # 250), is DENIED;

(3) Defendants Grace, Stringer, Wolter and Bettacchi's motion to dismiss Counts II through IV of the Indictment for failure to allege breach of an emissions standard (dkt # 254) is DENIED;

(4) Defendants Grace, Stringer, Wolter and Bettacchi's motion to dismiss Counts II through IV of the Indictment for failure to sufficiently apprise the Defendants of the nature of the offense charged (dkt # 255) is DENIED;

(5) Defendant Grace's motion to dismiss Counts II through IV of the Indictment on statute of limitations and duplicity grounds

---

**35.** The government filed a petition for rehearing which was denied on October 31, 2005. 429 F.3d at 835.

(dkt # 249) is GRANTED with respect to the criminal offenses charged in Counts II through IV which were completed as of November 3, 1999; in all other respects, the motion is DENIED; and

(6) The government's motion to dismiss Counts V and VI pursuant to Rule 48(a) is GRANTED; Defendants Grace, Stringer, Wolter and Bettacchi's motion to dismiss Counts V and VI for failure to state an offense (dkt ##252, 253) is DENIED as moot.